CRABTREE, J.T.C.
These are local property tax cases, consolidated for trial, briefs, and decision, wherein plaintiff seeks review of the 1995 regular and added assessments on its property located at 1000 First Street, Harrison, New Jersey (Block 86, Lot 1C). The assessments in controversy were as follows:
REGULAR ASSESSMENT
Land $1,363,100
Buildings 2,736,900
Total $4,100,000
ADDED ASSESSMENT
Land -0-
Buildings $ 83,333 ($250,000 prorated for 4 months)
Plaintiff first appealed both assessments to the Hudson County Board of Taxation, which affirmed the assessments without prejudice. The county board judgments were then appealed to the Tax Court.
*377 The subject of the controversy is an industrial building containing 244,583 square feet and sited on 6.815 acres of land. The building, which was approximately 50 years old on the valuation date, is of concrete block and steel frame construction and contains some 50,000 square feet of improved office area.
Prior to the addition completed in or about March 1995, the building contained three overhead loading doors. The office area was in disrepair and in need of new walls, ceilings, and floor covering. The property had been vacant for about three years prior to its acquisition by plaintiff on May 5, 1994. Between its acquisition of the property and the end of March 1995, plaintiff renovated the office area with new sheetrock walls, drop ceilings, and floor covering. Plaintiff also installed three additional overhead loading doors and upgraded the electrical system, the wet sprinkler system, and the HVAC system. Plaintiff also installed a demising wall separating the space leased to two tenants. These renovations and upgrades, together with the new overhead doors and the demising wall, appear to be the basis for the added assessment. No proofs were submitted by either party concerning the costs of these items, either separately or in the aggregate.
Plaintiff purchased the subject property from Harrison Riverside Ltd., a partnership owned by Hartz Mountain, on May 5, 1994, for $2,150,000. As indicated earlier, the property was vacant at the time of such purchase and had been, vacant for about three years prior thereto. In July 1994, plaintiff leased 53,600 square feet of space in the building to Print Perfect Express, Inc. for five years at $3.21 per square foot, plus 22% of the taxes in excess of the taxes for base year 1994. In January 1995, plaintiff leased 53,600 square feet of space to Inner Secrets, Inc. for five years at $3.25 per square foot, plus 22% of the taxes in excess of the taxes for base year 1994. The demising wall referred to above was installed by plaintiff to separate the space demised to the two tenants.
Plaintiffs expert estimated the true value of the subject property on October 1, 1994, prior to the renovations and upgrades described above, to be $2,300,000. In arriving at this estimate he *378 relied upon the sales comparison and income approaches to value, placing principal reliance upon the sale of the subject to plaintiff on May 5, 1994. For added assessment purposes the expert estimated the true value of the subject property to be $2,740,000. In arriving at this estimate he relied solely upon the income approach to value.
Although the expert relied primarily upon the sale for his estimate of true value in connection with the regular assessment, he also sought support from five allegedly comparable sales of other industrial properties in Harrison, Hillside, Hoboken, Kearny, and North Brunswick. The sales occurred between September 28,1992 and August 28,1996, and the sale prices ranged from $2.68 per square foot to $16.86 per square foot. The sizes of the improvements varied from 97,825 square feet to 767,000 square feet. After adjustments for size, condition, land-to-building ratio, ceiling clearance, percentage devoted to office space, and, in one instance, post-settlement cleanup costs, the expert arrived at adjusted sale prices ranging from $7.25 per square foot to $12.65 per square foot. On the basis of these comparables, and including the sale of the subject, the expert concluded that the true value of the subject, using the sales comparison approach, was $9.00 per square foot, or $2,200,000 (rounded).
For his income approach, the expert relied upon seven allegedly comparable leases to arrive at an economic rent estimate. Two of these leases were the leases in the subject property described above. Another lease was not a lease at all, but merely an offering to lease the subject property circulated by plaintiff’s predecessor-in-title. The allegedly comparable leases in the properties, other than the subject, were executed in 1991 and 1993. They involved net square foot rentals of $1.83, $2.06, $2.52 and $2.60. The areas leased were 48,990 square feet, 28,173 square feet, 376,000 square feet and 48,600 square feet. After minor adjustments for size, ceiling clearance, percentage devoted to office, and on-site parking or loading, the square foot rentals were $1.83, $1.85, $2.15 and $2.21. The contract rentals in the subject were adjusted for condition, size, and office percentage. The *379 expert also converted the leases from gross to net by estimating the base year (1994) taxes, the limit of the lessor’s responsibility, at 20% of the contract rent. After these adjustments and conversion from gross to net, the expert posited rents in the subject at $2.09 and $2.11. On the basis of the foregoing, the expert estimated economic rent for the subject prior to the renovations, upgrades, and additions (the demising wall and the three new overhead doors) at $1.80 per square foot.
The expert went on to project a vacancy and loss allowance of 10% and operating expenses of 31.4% of effective gross income (5% management, 3.7% leasing commissions, 10% structural reserves and 12.6% tenant alterations) to arrive at net operating income of $271,933, which he capitalized at 11.24%, using the band of investment mortgage-equity method.[1] This resulted in a value estimate of $2,420,000, rounded.
The expert reconciled the sales comparison and income approaches by positing a final value estimate of $2,300,000.
In estimating the true value of the subject property for added assessment purposes, the expert relied exclusively upon the income approach. He relied upon the same comparable leases, including the two leases in the subject, but simply added 10% to his income estimate, and relied upon the same vacancy and loss allowance and expense ratios to posit net operating income of $307,703, which he capitalized at 11.24%, under the band of investment mortgage-equity method, to arrive at true value for added assessment purposes of $2,740,000, rounded.
Finally, the expert applied the municipality’s general average ratio, duly calculated and promulgated by the Director, Division of Taxation, at 87.69%, to the true value estimated for added assess *380 ment purposes, and subtracted therefrom the taxable value determined by applying the same general average ratio to his true value estimate prior to the added assessment in order to fix the amount of the added assessment. This was $385,800 ($2,402,710 less $2,016,870, rounded), prorated for four months at $128,600 (rounded).
Defendant’s, expert estimated the true value of the subject property to be $4,400,000 on the assessing date.[2] In arriving at this conclusion, he utilized both the sales comparison and income approaches to value, placing principal reliance upon the latter. His sales comparison approach reflects a value estimate of $5,425,-600, which is considerably higher than the value estimate developed under the income approach. As defendant’s expert relied primarily upon the income approach, the value developed under the sales comparison approach will be disregarded. The sales comparison approach figures in this case principally because of plaintifPs expert’s reliance upon the sale of the subject as probative of its true value.
Defendant’s expert posited economic rent of $2.50 per square foot. To support this estimate he relied upon four net leases of allegedly comparable properties, all located in Harrison. Those leases, executed in 1992, 1993 and 1995, provided for rentals ranging from $3.35 to $4.45 per square foot. After some minor adjustments for building age, size, and condition, the square foot rentals ranged from $2.88 to $3.56. The expert also relied upon the leases in the subject property, which, as stated earlier, called for square foot rentals of $3.21 and $3.25. The expert converted those rents from gross to net by subtracting the 1994 taxes, which he estimated at $0.54 per square foot, thereby arriving at net rentals of $2.46 per square foot and $2.71 per square foot. He testified that he relied primarily upon the rents payable under the *381 subject leases, adjusted to account for the tax stop, in arriving at his estimate of economic rent.
The expert posited a vacancy and loss allowance of 5% and operating expenses of 16.4% (3% management, 8.4% structural reserves (expressed as $0.20 per square foot), 3% leasing commissions and 2% miscellaneous) to arrive at net operating income of $468,253, which he capitalized at 10.64% to obtain his final value estimate of $4,400,000 (rounded). His capitalization rate was developed under the band of investment mortgage-equity method, using the same positions and mortgage component as plaintiffs expert. The experts differed only in the equity component, plaintiff positing 13% and defendant 11%. The difference was 60 basis points.
The first issue to be resolved is whether the sale to plaintiff, closed on May 5,1994, is probative of the property’s true value on the assessing date. It is well settled that the selling price of real property involved in a judicial determination of its assessable value is a “guiding indicium” of fair value and ordinarily is merely evidential, although under certain circumstances it might become controlling. Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985); Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 65 A.2d 828 (1949); Rek Investment Co. v. City of Newark, 80 N.J.Super. 552, 194 A.2d 368 (App.Div.1963); Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242 (Tax 1993), aff'd o.b. per curiam, 15 N.J.Tax 190 (App.Div.1995). The evidence in this case shows that the price which plaintiff paid for the subject property is not the best indication of its true value. The sale price, stated as a function of the square footage of the building, is $8.79. If the court were to find, as it does, that the rents payable under the two leases in the subject, executed in dose proximity to the assessing date, represented the fair market (economic) rent, after adjusting for the tax stop, and that the vacancy and loss allowance and operating expenses were as posited by plaintiffs expert, the net operating income would amount to $1.54 per square foot, or a return of 17.52%, a rate of return substantially in excess of the rates of return posited by both *382 experts. Also, the property was vacant for two years, a fact which undoubtedly imparted a sense of urgency to the former owner’s desire to unload the property. While Hartz has the well-deserved reputation of being the most successful commercial real estate developer in New Jersey, it also has the reputation of cutting its losses. That appears to be the case here. As defendant’s expert observed, in response to one of the court’s questions, some transactions are more influenced by business decisions than by real estate decisions.
It seems clear from the evidence that the subject property is of the type that is bought and sold for its income. The record shows that the property was leased for some years prior to its sale to plaintiff. Moreover, plaintiff, within a few months after acquiring the property, leased almost half the total square feet of the building to two tenants. Thus, the property should be valued on the basis of its income. It is well settled that the income capitalization approach is the preferred method for determining the taxable value of income-producing property. Parkway Village Apartments v. Cranford Tp., 108 N.J. 266, 528 A.2d 922 (1987); Helmsley v. Fort Lee Bor., 78 N.J. 200, 394 A.2d 65 (1978), appeal dismissed, 440 U.S. 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). Fort Lee v. Hudson Terrace Apartments, 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980), certif. denied, 85 N.J. 459, 427 A.2d 559 (1980); Shav Assocs. v. Middletown Tp., 11 N.J.Tax 569 (Tax 1991).
The economic rent posited by defendant’s expert is highly probative, resting, as it does, upon the leases in the subject executed in close proximity to the assessing date. The expert’s approach to converting the leases from gross to net by deducting an amount equal to the tax stop is eminently sound. The adjusted rents posited by plaintiffs expert from other properties, on the other hand, bear no relation to the rents reflected by the leases in the subject property. In this same connection, the adjustments made by plaintiffs expert to the rents under the subject leases are palpably unsound. Adjustments within the subject property itself, as distinguished from adjustments between comparables and the *383 subject, are inappropriate. The only adjustment worth considering in this regard is the conversion of gross rent to net rent, and the court has already concluded that the conversion method adopted by defendant’s expert is more persuasive.[3]
Accordingly, the court finds the economic rent for the subject to be $2.50 per square foot, as postulated by defendant’s expert.
The vacancy and loss allowance of 5% posited by defendant’s expert is more persuasive than the 15% posited by plaintiffs expert. As defendant’s expert points out, almost 50% of the subject was leased within a very short time after plaintiffs acquisition. Also, as the expert indicated, the former Western Electric building, containing 2.5 million square feet, was 85% leased within two years after it came on the rental market. Finally, as the expert observed, industrial rents in Harrison and Kearny are less than those in Secaucus and North Bergen, a fact which accounts for more favorable occupancy rates in the two former municipalities.
While a vacancy and loss allowance is a subjective judgment of the long-term quality and durability of the income stream, RTC Properties v. Kearny, 13 N.J.Tax 146 (Tax 1993), the analysis of defendant’s expert is more credible than the analysis of plaintiffs expert on this issue. The probative quality of an expert’s opinion depends not only upon the facts offered in support of that opinion, but also upon the persuasive character of the expert’s analysis. Dworman v. Tinton Falls Bor., 1 N.J.Tax 445 (Tax 1980), aff'd o.b. per curiam, 3 N.J.Tax 1 (App.Div.1981). Thus, the court finds that the appropriate vacancy and loss allowance is 5% of gross income.
*384 With one exception, the expenses postulated by plaintiffs expert are reasonable. (His assumption of a 5% management fee is consistent with a multi-tenanted building.) That exception is his assumption of an allowance of 12.6% of effective gross income for tenant alterations. The evidence does not support the expert’s conclusion that workletters typically include $5 per square foot for improved office area, nor the amortization of such amount over five years. Moreover, the amount expended, in any event, would depend upon the extent of the alterations, which, in turn, would be governed by the condition of the property and whether a dismantling of alterations made for a prior tenant was required.
Thus, the court finds that the operating expenses constitute 18.7% of effective gross income.
Finally, while the experts differ insubstantially on the capitalization rate, the overall rate posited by plaintiffs expert is marginally more reflective of the risk associated with a property of the subject’s age (50 years more or less on the assessing date) and physical condition.
In view of the foregoing, the court finds the true value of the subject property on the assessing date to be $4,201,600.
The general average ratio duly promulgated by the Director, Division of Taxation, for defendant municipality for tax year 1995 is 87.69%. The upper limit of the common level range for tax year 1995 for Harrison is 100%. The ratio of the assessment to the true value as herein found is 97.58%. As this ratio is within the common level range, plaintiff is not entitled to relief under N.J.S.A. 54:51A-6, and the assessment will accordingly be affirmed.
The added assessment will be cancelled.
The evidence shows that the major work done on the subject property following plaintiffs acquisition was in the nature of retrofitting, upgrading, and rectifying deferred maintenance. While the evidence does indicate that a demising wall was installed, along with three more overhead loading doors, no proofs were *385 forthcoming about the cost either of those items or of the retrofitting and upgrading.
To justify an added assessment, it must be shown that a building or other structure was “erected, added to or improved” after October 1 of the pretax year and completed between the following January 1 and October 1. N.J.S.A. 54:4-63.3. The critical issue here is whether the work done represented an addition or improvement to the property within the meaning of the added assessment statute. The mere retrofitting, upgrading or remediation of deferred maintenance does not constitute an addition to the property; nor does it constitute an improvement. The term “improved,” as used in the statute must, under the doctrine of ejusdem generis, be read in the context of the word “added” as used in the statute. That is to say, an improvement is in the nature of an addition. Resnick v. East Brunswick Tp. Bd. of Educ., 77 N.J. 88, 389 A.2d 944 (1978); Manczak v. Dover Tp., 2 N.J.Tax 529 (Tax 1981).
The mere fact that the work done increased the value of the property, as both experts seem to agree, is irrelevant. That increase in value can be reflected in the assessment for tax year 1996.
Judgment will be entered in accordance with this opinion.

 70% mortgage, 9.5% interest, 25 years amortization, constant 7.34% of 10.48%
30% equity (cash-on-cash) @ 13% 3.90%
Overall rate 11.24%

 The expert failed to address the added assessment issue in both his appraisal and in his testimony at the trial. As will be seen, however, such failure is irrelevant, as the court finds that the added assessment was improperly imposed.

 The third alleged comparable lease from the subject property utilized by plaintiff's expert was not a lease at all, but merely an offering circulated by the prior owner. Lease offerings, like sales offerings, are not evidentiary and may not be considered in determining a property’s economic rent. Irvington v. 1125-1127 Clinton Ave. Assocs., 5 N.J.Tax 420 (Tax 1983). Cf. Genola Ventures v. Shrewsbury Bor., 2 N.J.Tax 541 (Tax 1981) (sales offerings).