BIANCO, J.T.C.
This is the court’s determination regarding a direct local property tax appeal for the 2000 tax year, concerning property located at 125 Monitor Street in Jersey City, County of Hudson, and designated as Lot A in Block 2094 by the taxing district (the “subject property”). The subject property is currently owned by Plaintiff, 125 Monitor Street, LLC (the “Taxpayer”).
Defendant Jersey City (the “City”) assessed the subject property for the 2000 tax year as follows:
Land: $ 365,900
Improvements: $ 788,600
TOTAL: $1,154,500
The average ratio as promulgated by the Director of the Division of Taxation pursuant to N.J.S.A. 54:1-35a to -35c (L. 1973, c. 123) for 2000 in Jersey City is 87.40%, with the upper limit of the common level range being 100.51%, and the lower limit being 74.29%.
The slightly irregular-shaped subject property contains roughly *236 2.18 acres of land area[1] and encompasses an entire city block. It has frontage on three streets: Johnston Avenue, Pine Street and Monitor Street,[2] and is located in the R-2 Low-Density Residential District pursuant to the current Jersey City Zoning Ordinance (the “zoning ordinance”). The subject property conforms to some of the zoning requirements including minimum lot size, width, and depth as set forth in the zoning ordinance. The existing industrial use, however, is not a permitted use under the zoning ordinance. The improvements violate several zoning requirements including lot coverage and yard setbacks. Based upon the zoning ordinance, the use of the subject property is non-conforming.
The subject property is improved with a series of interconnected brick industrial buildings containing approximately 116,000 square feet of gross building area.[3] The main building is a six-story warehouse. There is a two-story brick building and a single story transit building to the east of the main building. The site has a large parking area fronting Johnston Avenue. The building is currently designed for multiple tenants and the predominant uses are light manufacturing and warehousing. The transit building is currently used for truck repair. Both parties agreed that the buildings are in poor condition compared to modem buildings, but the City contends that the main building is in average condition compared to buildings of similar age and construction.
Hudson United Bank (“Hudson”), acquired the subject property through a merger with Washington Savings, another banking institution that previously acquired title through foreclosure in June of 1994. Hudson and Taxpayer entered a contract for the sale of the subject property on May 4, 1999 for $760,000 (before the assessment date of October 1, 1999). The sale of the subject *237 property closed on March 15, 2000 (five and a half months after the aforementioned assessment date).
Hudson conveyed the subject property to the Taxpayer, although portions of the subject property are or were contaminated; the source (or sources) of that contamination is not known. In January 1998, Hudson filed a Declaration of Environmental Restriction (“DER”) for a portion of the subject property. The DER was required by the New Jersey Department of Environmental Protection as part of a remedial approval granted in March of 1995. In the DER, Hudson agreed to be “subject to the regulatory and statutory requirements applicable to those who seek to remediate property to a non-residential standard.” The affected area is identified as a 32,000 square foot parking area. This area must continue to be put to a non-residential use and must be covered with an impermeable cap. The City contends that the contamination has been remediated and the cap is in place.
Each party engaged the services of a professional real estate appraiser to provide an opinion of value of the subject property. The parties agreed that each one’s appraiser was qualified to testify as an expert. Both experts prepared appraisal reports that were admitted into evidence. Both experts utilized the sales comparison approach to value the subject property. The City’s expert also utilized the income approach. The Taxpayer’s expert considered the income approach, but testified that he gave no weight to that method of valuation. Instead, the Taxpayer’s expert relied heavily upon the sales comparison approach placing much emphasis on the sale of the subject property that was negotiated before but closed after the relevant assessment date (i.e. October 1, 1999), as the primary indicator of value. The Taxpayer contends that even though the subject property was other real estate owned property from Hudson’s inventory, the sale of that property to one of Hudson’s banking customers should be considered as .an arm’s-length market transaction. Neither expert utilized the cost approach to value.
There is no single determinative approach to the valuation of real property. Samuel Hird & Sons, Inc. v. City of Garfield, *238 87 N.J.Super. 65, 72, 208 A.2d 153 (App.Div.1965); ITT Continental Baking Co. v. East Brunswick, 1 N.J.Tax 244 (Tax 1980). The choice of the predominant approach will depend upon the facts of each case and the reaction of the experts to those facts. City of New Brunswick v. Div. of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963); Pennwalt Corp. v. Holmdel Tp., 4 N.J.Tax 51, 61 (Tax 1982). Here, the court finds, as did each expert witness, that the sales comparison approach is the most persuasive.
I. LEGAL STANDARD
To successfully appeal a property tax assessment, a taxpayer must first overcome the presumption of the validity of the assessment. See Glen Wall Assoc. v. Wall Tp., 99 N.J. 265, 273, 491 A.2d 1247 (1985). There is a presumption in favor of the amount of the assessment as made by the local taxing authority, and the burden of proving an excessive valuation is on the landowner. Colonial Life Insurance Co. v. State Board of Tax Appeals, 126 N.J.L. 126, 127, 18 A.2d 625 (N.J.Sup.1941); Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-413, 495 A.2d 1308 (1985); Township of West Milford v. Van Decker, 235 N.J.Super. 1, 15, 561 A.2d 607 (App.Div.1989), aff'd, 120 N.J. 354, 576 A.2d 881 (1990). In order to overcome that presumption, the taxpayer must produce evidence of the true value of the property that is “ ‘definite, positive and certain in quality and quantity’...” Pantasote at 413, 495 A.2d 1308. (quoting Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 105, 89 A.2d 385 (1952)). Indeed, the evidence “must be based on ‘sound theory and objective data’, rather than on mere wishful thinking.” MSGW Real Estate Fund v. Mountain Lakes Bor., 18 N.J.Tax 364, 376 (Tax 1998) (quoting FMC Corp. v. Unmack, 92 N.Y.2& 179, 188, 677 N.Y.S.2d 269, 699 N.E.2d 893 (1998)). For the reasons stated herein, this court finds that Taxpayer has not met its burden of proof.
II. SALE OF THE SUBJECT PROPERTY
The fundamental standard for determining the value of real estate for purposes of taxation is its actual market value, and a commonly used test in arriving at market value is the estimated *239 price the property ought to bring in the open market. N.J.S.A. 54:4-23. See also, Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247. In this case, the Taxpayer argues that the negotiation and purchase of the subject property for $760,000[4] represents its true market value regardless of the fact that the seller was a bank (i.e. Hudson). Market value is defined as:
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
[Appraisal Institute, The Appraisal of Real Estate, 22 (12th ed.2001).]
“[I]t is well settled that a bona fide sale of property may be indicative of the true market value of the property.” Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247. However, price is not necessarily controlling but is only evidential of the property’s true value. Ibid. See also, City of Newark v. Tunis, 82 N.J.L. 461, 81 A.722 (E. & A.1911) (holding that true value is not always related to selling price and that special circumstances may increase or depress market value without affecting true value); and Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J.Super. 65, 208 A.2d 153 (App.Div.1965) (holding that although “the seller was under a greater economic compulsion to sell than the ideal hypothetical 'willing seller’”, the sale could be still be one valuation factor in measuring property value). “It is for the court to appraise the circumstances surrounding a sale to determine if there were special factors which affected the sale price without *240 affecting the true value.”[5] Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247. See also, Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 162-68, 65 A.2d 828 (1949) (holding that the determination must be made by “weighing and appraising of all component factors and adventitious circumstances.”)
“[The City] is free to rebut evidence of a sale price with evidence that the sale was ... not made at arm’s length, was a distress sale, or was a sham.” Glen Wall Assoc., supra, 99 N.J. at 282, 491 A.2d 1247. In this case, the City argues that the sale was not an arm’s-length sale because the seller (Hudson) made an inadequate attempt to market the property. The court agrees. After examining the totality of the circumstances surrounding the sale of the subject property, this court finds that the sale is not indicative of its true value.
Typically in bank sales, the circumstances surrounding the sale may indicate a depressed price of the property. See Whippany Assoc. v. Hanover Tp., 1 N.J.Tax 325, 330 (Tax 1980). The fact that a sale of property was by a bank is a factor regarded as impairing the reliability of the sale price as evidence in determining the property’s value for taxation purposes. City Holding Co. v. State Board of Tax Appeals, 127 N.J.L. 168, 169, 21 A.2d 289 (Sup.Ct.1941). In Whippany, the court found the sale price of a subject property not to be a true indication of its value when the bank had a great compulsion to sell the property after foreclosure in order to cover the mortgage loan as quickly as possible.[6] Whippany Assoc., supra, at 330. See also, City Holding, supra, *241 127 N.J.L. at 169, 21 A.2d 289 (finding that the fact that a quick resale of property by a bank that had recently acquired title by foreclosure impairs the integrity of the sale price and is not conclusive of the true value of the property). See also, Connecticut Sav. Bank v. New Haven, 131 Conn. 575, 41 A.2d 765 (1945) (holding that, because the seller bank had acquired title to the subject properties by foreclosure, it was, in a sense, an unwilling holder diminishing the weight to be given to the sales prices in valuing the properties for taxation purposes); People ex rel. Woollard v. Lewis, 256 A.D. 872, 9 N.Y.S.2d 330 (1939) (holding that because the sales in question were “bank sales” and thus a factor that compelled the seller to dispose of the properties, the transaction affected the use of the sale prices as evidence of the properties’ value for taxation purposes). Here, Hudson acquired the previously foreclosed subject property through merger and was required to resell the property within five years from the date of acquisition. This factor motivated the bank to sell the property in an expeditious manner.
Furthermore, in American Cyanamid Co. v. Wayne Township, 17 N.J.Tax 542, 579-80 (Tax 1998), aff'd, 19 N.J. Tax 45 (App.Div. 2000), the court found the sale of the subject property was of no assistance because the seller was unusually motivated and wanted to get the property “off their books.” Ibid. In Standard Bleachery & Printing Co. v. Borough of East Rutherford, 112 N.J.L. 81, 169 A. 350 (E. & A.1934), the court declined to modify the assessment of a subject property based upon the sale price of the property stating that:
while the sale . . may be considered as some evidence of value, there is every reason to regard the sale as more or less a forced one. As is well known, bondholders’ committees do not want to take over a business property of this type and operate it. They want their money, and as a rule avail of the first opportunity to realize this result.
In this case, Hudson was not in the real estate business and was not equipped to operate such a business after it acquired the property. Therefore, it is reasonable to conclude that Hudson was motivated to sell the subject property because it was a nonperforming asset on Hudson’s books.
*242 In addition, a period of vacancy of the property may create a greater incentive to sell the property under duress for a price that is lower than market value. See Harrison Realty Corp. v. Town of Harrison, 16 N.J.Tax 375, 382 (Tax), aff'd, 17 N.J.Tax 174 (App.Div.1997). In Harrison, the court determined that (1) there was a sense of urgency to sell the property because it had been vacant for two years prior to its sale, and (2) that the sale price was not the best indication of the property’s value. Ibid. In this case, the subject property had a vacancy rate of 50% at the time it was purchased by the Taxpayer. This factor can reasonably be viewed as additional motivation to Hudson to sell the subject property quickly.
Two other factors in determining the credibility of the sale include the way the property was marketed and the amount of time it was marketed. In Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242, 302 (Tax 1993), the court found that the property was “ably and professionally exposed” to the marketplace for enough time to attract a reasonable number of buyers when the selling party marketed the property worldwide and had received three definite offers from potential buyers. Ibid. However, in American Cyanamid Co., supra, 17 N.J.Tax at 580, the court found the sale was not indicative of the true value because the property was marketed for a limited period of time in a limited manner with no formal marketing plan. Here, while Hudson may have informed the commercial brokers in the area of the availability of the subject property, no attempt was made to secure a broker. The subject property was not listed for sale to the general public and not marketed to anyone except to Hudson’s own banking customers. It is clear that the totality of the factors surrounding the sale influenced Hudson to sell the subject property for what it could get and not for its true market value. Accordingly, the court finds that the sale was not a bona fide sale nor was it a true indication of the subject property’s value.
III. COMPARABLE SALES
Comparable sales may provide evidence that is helpful in ascertaining and determining the true value of a particular *243 piece of property. See Inmar Associates Inc. v. Edison Tp., 2 N.J.Tax 59, 66 (Tax 1980). However, the sales must be sufficiently alike in some significant respects to permit a finding of comparability. Ford Motor Co. v. Edison Tp., 127 N.J. 290, 307, 604 A.2d 580 (1992) (citing Moorestown Tp. v. Slack, 85 N.J.Super. 109, 204 A.2d 23 (App.Div.1964)). Adjustments are made between a comparable property and the subject property so that an estimate of value can be determined. U.S. Life Realty Corp. v. Jackson Tp., 9 N.J.Tax 66, 72 (Tax 1987). Adjustments that are too large suggest a lack of comparability between the concerned sales and the subject property and present a misleading indication of the subject property’s value. See, e.g., Global Terminal & Container Service v. City of Jersey City, 15 N.J.Tax 698 (App.Div.1996) (affirming the Tax Court’s rejection of comparable sales because of the magnitude of gross adjustments). See also, Appraisal Institute, The Appraisal of Real Estate, 447 (12th ed. 2001) (“A net adjustments figure may be misleading because one cannot assume that any inaccuracies in the positive and negative adjustments will cancel each other out.”).
In Pepperidge Tree Realty Corp. v. Kinnelon Borough, 21 N.J.Tax 57 (Tax 2003), the expert appraiser presented four comparable sales, three of which had gross adjustments in the following respective amounts: 30% plus 10% for time; 30% plus 10% for time; and 45% plus 11% for time. The court found that the large percentage of adjustments raised doubt as to the comparability of the sales. Id. See also, M.I. Holdings v. City of Jersey City, 12 N.J.Tax 129, 137 (Tax 1991) (finding that adjustments of 22% to 63% were incompatible to the subject property and not probative of its true value).
Similarly in this ease, the Taxpayer’s expert appraiser made large gross adjustments to all four of his proposed comparable sales. His gross adjustments to sale Number 1 were 20% plus 3% for time, his gross adjustments to sale Number 2 were 45% plus 10% for time, his gross adjustments to sale Number 3 were 35% plus 12% for time, and his gross adjustments to sale Number 4 were 40% with no time adjustment. The extent of these adjust *244 ments raises doubt as to the comparability of these sales to the subject property.
Since the court finds insufficient comparability and a lack of similarity between the subject property and the Taxpayer’s proposed comparable sales, and since the court further finds that sale of the subject property was not a bona fide arms-length sale, it is the opinion of this court that the Taxpayer has not produced evidence of the true value of the property that is definite, positive and certain in quality and quantity so as to over-come the presumption of validity afforded the assessment. Therefore, the City’s tax assessment of the subject property for the 2000 tax year is affirmed. The Tax Court Clerk is directed to enter judgment consistent with this opinion.

 The Taxpayer says 94,961 sq. ft.; the City says 94,844 sq. ft.

 The parties .agree that the site has about 421 feet of frontage on Monitor Street, about 200 feet on Johnston Avenue, and about 528 feet on Pine Street.

 The Taxpayer contends that there are 116,600 square feet of gross building area. The City contends that there are 115,646 square feet of gross building area.

 Although the contract for the sale of the subject property was signed on May 4, 1999 (five months before the assessment date) but did not close until March 15, 2000 (five and a half months after the assessment date), the court is required to consider both the contract of sale and the actual sale when determining the value of the subject property. Glen Wall Assoc., supra, 99 N.J. at 283, 491 A.2d 1247. See also, Linwood Prop. v. Fort Lee Bor., 7 N.J.Tax 320, 330 (Tax 1985) (holding that both a contract signed before the assessment and a sale executed after the assessment must be analyzed by the court.) Furthermore, the fact that an event takes place after the assessment does not mean it should not be considered by the court. See Little Ferry Bor. v. Vecchiotti, 7 N.J.Tax 389 (Tax 1985).

 In accordance with N.J.A.C. 18:12-1.1, there are twenty-seven categories of deed transactions which are not usable by the assessor in determining assessment-sales ratios. One category includes transfers to "banks, insurance companies, savings and loan associations, mortgage companies, or any other lien holder, when the transfer is made in lieu of foreclosure." Ibid. These categories serve as a guide as to whether the sale was an arm's length transaction that reflects the fair market value of the subject property. See 1530 Owners Corp. v. Fort Lee Bor., 135 N.J. 394, 403, 640 A.2d 811 (1994).

 See also, Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, 95 (Tax 1996) (finding that a foreclosed property may not have as many offers because purchasers knew of the seller’s strong desire to dispose of the property).