TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1st Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

December 1, 2017

John R. DeSheplo, Esq., as Attorney Trustee[1]
260 Columbia Avenue
P.O. Box 3240
Fort Lee, New Jersey 07024

William R. Betesh, Esq.
Boggia & Boggia, L.L.C.
71 Mt. Vernon Street
Ridgefield Park, New Jersey 07660

> Re:  Ashraf Shaker v. Village of Ridgefield Park
>        Docket Nos. 017896-2012, 014599-2013, 013446-2014

Dear Mr. DeSheplo and Mr. Betesh:

This letter constitutes the court's opinion following trial of plaintiff, Ashraf Shaker's ("plaintiff"), challenge to the 2012, 2013, and 2014 local property tax assessments on his improved property located at 54 Mount Vernon Street, in the Village of Ridgefield Park, County of Bergen, and State of New Jersey.

For the reasons stated more fully below, the court affirms the 2012, 2013, and 2014 tax year local property tax assessments.

---

[1] Thomas A. Blumenthal represented Ashraf Shaker during trial. On October 10, 2017, an Order was entered disbarring Thomas A. Blumenthal and restraining him from the practice of law. John R. DeSheplo, Esq. is the court appointed attorney trustee, responsible for overseeing the disposition of Mr. Blumenthal's matters.

## I. Procedural History and Factual Findings

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered at trial in this matter.

Plaintiff is the owner of the real property and improvements located at 54 Mount Vernon Street, Ridgefield Park, New Jersey. The property is identified on the municipal tax map of the Village of Ridgefield Park as Block 65, Lot 18 (hereafter referred to as the "subject property"). For the 2012, 2013, and 2014 tax years, the subject property bore an assessment as follows:

| | |
|---|---|
| Land: | $183,200 |
| Improvements: | $256,500 |
| Total | $439,700 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for the Village of Ridgefield Park ("defendant") was 90.42% for the 2012 tax year, 89.61% for the 2013 tax year, and 87.37% for the 2014 tax year. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the implied equalized value of the subject property is: $486,286.21, for the 2012 tax year; $490,681.84, for the 2013 tax year; and $503,261.98, for the 2014 tax year.

The subject property consists of a rectangular shaped 5,822 square foot or 0.1337-acre lot, containing approximately 50 feet of frontage along Mount Vernon Street. The subject property is improved with a 2½-story residential structure, constructed in approximately 1910, and is attached to a 1-story commercial structure. The 1-story commercial structure is attached to the right front corner of the residential structure, and extends to the front lot line of the subject property. The 1-story commercial structure is owner-occupied and operated as a restaurant and bar, known as "Luigi's." The two buildings contain an aggregate of approximately 3,408 square feet of finished area at or above grade level. The 1-story commercial structure contains approximately 710 square

2

feet of finished area, at grade level, and contains approximately 700 square feet of finished area below-grade.[2] The restaurant consists of a dining area, a bar, and two 2-fixture bathrooms. The restaurant's kitchen is located below-grade, immediately beneath the 1-story structure, and occupies approximately 700 square feet. The rear 2½-story residential structure contains two one-bedroom apartments. The property also contains a detached two-car garage.

Plaintiff offered testimony that the rear 2½-story residential structure was being used as a two-family dwelling when he acquired the subject property. However, zoning fines were apparently levied on plaintiff because use of the residential structure as a two-family dwelling was not a legally permitted use. Accordingly, in or about late 2011 or early 2012, plaintiff was granted variance relief by defendant's zoning board of adjustment, to convert the residential structure from a single-family dwelling into a two-family dwelling. Plaintiff did not pay the outstanding fines until 2015. According to plaintiff, certain renovations are needed to the plumbing stack and electrical system in the residential structure to obtain a certificate of occupancy for the 2nd floor apartment unit.

Plaintiff initially filed Petitions of Appeal challenging the subject property's 2012, 2013, and 2014 tax year local property tax assessments with the Bergen County Board of Taxation (the "Board"). The Board entered Memorandums of Judgment affirming the tax assessments (the "Judgments"). Thereafter, plaintiff timely filed Complaints with the Tax Court challenging the Judgments.

Plaintiff offered testimony from a State of New Jersey certified general real estate appraiser, who was accepted by the court, without objection, as an expert in the field of property

---

[2] In opening remarks to the court, defendant's counsel offered that the below-grade level of the subject property contains an additional 395 square feet area, utilized as a storage for the restaurant and kitchen. However, defendant offered no evidence or testimony to the court regarding this storage area, its use, or dimensions.

valuation ("plaintiff's appraiser" or "expert"). Plaintiff's appraiser prepared an appraisal report expressing his opinion that the true market value of the subject property was $340,000, as of the October 1, 2011, October 1, 2012, and October 1, 2013 valuation dates.

## II. Conclusions of Law

### a. Presumption of Validity

At the close of plaintiff's proofs, defendant moved to dismiss plaintiff's Complaints under R. 4:37-2(b), arguing that: (i) plaintiff's appraiser failed to verify the sales data contained in his appraisal report, thereby producing an unreliable result; and (ii) plaintiff's appraiser's adjustments were not supported by objective market data. Thus, defendant maintained that plaintiff failed to overcome the presumption of validity. According plaintiff all reasonable and legitimate inferences that could be deduced from the evidence presented, the court concluded that, plaintiff overcame the presumption of validity, and denied defendant's motion. See MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 376 (Tax 1998). The court placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer. . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)).

b. Highest and Best Use

In the court's pursuit to determine the true market value of the subject property, consideration must be given to that price which a hypothetical buyer would pay a hypothetical seller, neither of which are constrained to purchase or sell the property, as of October 1 of the pretax year. See Petrizzo v. Edgewater, 2 N.J. Tax 197, 200 (Tax 1981); Genola Ventures v. Shrewsbury Bor., 2 N.J. Tax 541, 551 (Tax 1981). An indispensable element to the process of property valuation and to the determination of true market value is discerning a property's highest and best use. Ford Motor Co., supra, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b., 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992). See also General Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005). "For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). Thus, the highest and best use analysis is often referred to as "the first and most important step in the valuation process." Ford Motor Co., supra, 10 N.J. Tax at 161.

The highest and best use analysis comprises the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. Township of South Hackensack, 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015). See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000).

Here, the expert's report stated that the subject property was located in defendant's R2 Single and Two Family Residential District, and further expressed that the highest and best use of the subject property 'as vacant land' was for "development with a residential use." Nonetheless, plaintiff's appraiser's report concluded that the existing use of the subject property, as a mixed-used commercial and residential structure, constitutes the highest and best use 'as improved'.

Effective cross-examination of the expert revealed that the subject property is actually located in defendant's C-1H Central Business District zone, with permitted uses that include retail facilities and restaurants. Thus, use of the subject property as a restaurant is a legal conforming use. According to plaintiff's appraiser, the appraisal report incorrectly identified the subject property's zoning district, however said error did not impact his overall conclusions of value.

The court concludes, as did the expert, that the highest and best use of the subject property is its present use as a mixed-use commercial and residential structure.

    c.   Methodology

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); ITT Continental Baking Co. v. East Brunswick Township, 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (internal citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Township, 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. Tax Appeals Div., 39 N.J. 537 (1963)). See also WCI-Westinghouse, Inc. v. Edison Township, 7 N.J. Tax, 610, 619 (Tax 1985), aff'd, 9 N.J. Tax 86 (App. Div. 1986).

### 1. Sales Comparison Approach

Here, plaintiff's appraiser employed the sales comparison approach to value the subject property. The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, The Appraisal of Real Estate 377 (14th ed. 2013). This approach requires the appraiser to engage in a "comparative analysis of properties" and to focus on the "similarities and differences that affect value. . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." Id. at 378.

Significantly, however, during cross-examination the expert conceded that the subject property is a commercial, income-producing property. Moreover, plaintiff's expert acknowledged that a prospective buyer would evaluate and consider the potential rental income generated from the apartment units, or the income generated from the restaurant. Plaintiff's expert further admitted that a prudent investor, considering purchasing the subject property, would analyze and examine the subject property's capacity to generate income and it associated operating expenses before acquiring it. However, according to the expert he could not value the subject property under the income-capitalization approach. In the expert's opinion, due to limited size of the commercial area, the presence of a below-grade kitchen, and the fact that "nobody could provide [the expert with] the costs to cure or remediate any issues [associated with the 2nd floor apartment] which preclude it from being occupied," it was impractical to employ the income-capitalization approach.

Plaintiff's appraiser further conceded during cross-examination that had the restaurant, or the 2nd floor apartment unit been leased, he likely would have employed an income-capitalization approach to value. The expert credibly testified that, prior to preparing his appraisal report, he requested information from plaintiff regarding the "costs to cure" the alleged building code

violations effecting the 2nd floor apartment unit. Despite his request, "that information was not provided" by the plaintiff to the expert. The expert further readily acknowledged that if he possessed the estimated costs to make the 2nd floor apartment unit suitable for habitation, he would have been able to perform an income-capitalization approach.

In performing his sales comparison approach, plaintiff's appraiser identified six (6) mixed-use buildings in Bergen County that sold between September 2010 and February 2013, which he deemed comparable. The unadjusted sale prices of the six sales ranged from $190,000 to $385,000, or $71 to $120 per square foot. Plaintiff's appraiser then applied a series of adjustments to the sales to account for perceived differences in condition (-10% to -15%), size (-5% to +10%), parking (-5% to +5%), and utility (+10%). After applying his adjustments, the adjusted sale prices ranged from $71 to $107 per square foot. The expert's analysis yielded a fair market value conclusion of $100.00 per square foot as of the October 1, 2011, October 1, 2012, and October 1, 2013 valuation dates.

Plaintiff's appraiser then applied the $100.00 per square foot value to the 3,408 square feet of above-grade area of the building, to arrive at his concluded value of $340,000 (3,408 x $100.00 = $340,800), as of the October 1, 2011, October 1, 2012, and October 1, 2013 valuation dates.

2. Analysis

However, the expert's investigation and analysis, and the conclusions derived therefrom, suffer from flaws that are fatal to their credibility and reliability. For each comparable sales transaction, plaintiff's appraiser: (i) was unable to identify how many square feet were attributable to commercial/retail use and how many square feet were attributable to residential use; (ii) could not identify whether the residential units were occupied or vacant at the time of sale; (iii) was unable to confirm any of the data reflected on the property record cards for the comparable sales,

as the expert did not review any of the property record cards; (iv) could not state whether any of the comparable sales were located in flood hazard areas; (v) was unable to offer any testimony regarding the status of the leases or rentals of the comparable sales, as the expert did not review the rent rolls or lease information for any of the comparable sales; (vi) was unaware how long each comparable sale was exposed to the marketplace; (vii) could not conclusively state whether the comparable sales were offered for sale through a broker or were sold privately; and (viii) did not know whether any of the comparable sales were purchased for owner occupancy purposes, or as an investment property. Moreover, the expert was seemingly unaware that Comparable sale 1, contained two commercial units. The expert was further unaware that Comparable Sale 3 was designated "not usable code" NU 26, for purposes of the Director of the New Jersey Division of Taxation's annual assessment-sales ratio study. See N.J.A.C. 18:12-1.1(a).

Furthermore, plaintiff's appraiser did not know if the any of the comparable sale transactions were subject to long-term lease agreements, or were sold vacant and free of all tenancies. Moreover, if any of the sale transactions were sold subject to long-term lease agreements, plaintiff's appraiser was unaware of the lease terms and whether those leases were at negotiated at market rates. It is well settled that, a "period of vacancy of the property may create a greater incentive to sell the property under duress for a price that is lower than market value." 125 Monitor Street LLC, supra, 21 N.J. Tax at 242. See also Harrison Realty Corp. v. Town of Harrison, 16 N.J. Tax 375 (Tax), aff'd, 17 N.J. Tax 174 (App. Div. 1997); Atlantic City v. Ginnetti, 17 N.J. Tax 354 (Tax 1998). Additionally, it is well-established that a property burdened by a long-term lease agreement, at below market rental rates, may drive down the sale price of the property.

9

Most significantly, the expert admitted that he did nothing, "other than checking the deed and the property tax records," to verify the accuracy and reliability of the sales information, or to confirm whether the comparable sales transactions were truly arms-length.

When engaging in the sales comparison approach, appraisers must adhere to a "systematic procedure[s]." The Appraisal of Real Estate, supra, at 381. They must conduct research of the competitive marketplace for "information on properties that are similar to the subject property" and that have recently sold. Ibid. A crucial element of this investigation and research involves the data verification process. An appraiser must verify the integrity of the information by "confirming that the data obtained is factually accurate and that the transactions reflect arm's-length market considerations." Ibid. During the data verification process an appraiser must "elicit additional information about the property such as buyer motivation, economic characteristics, [and] value component allocations. . . to ensure that comparisons are credible." Ibid. The process demands an appraiser "verify information with a party to the transaction to ensure its accuracy and gain insight into the motivation behind each transaction." Id. at 385. An appraiser must endeavor to confirm "statements of fact with the principals to the transaction. . . or with brokers, closing agents, or lenders involved." Ibid.

Our Legislature has mandated that, in Tax Court proceedings, any person being offered as a witness possess information or knowledge regarding comparable sales acquired from owners, sellers, purchasers, lessees, brokers or attorneys who were a party to, or participated in, the transaction. N.J.S.A. 2A:83-1. Specifically, N.J.S.A. 2A:83-1 requires that:

> in any action or proceeding in the Tax Court, any person offered as a witness in any such action or proceeding shall be competent to testify as to sales of comparable land, including any improvements thereon. . . from information or knowledge of such sales, obtained from the owner, seller, purchaser, lessee or occupant of such comparable land, or from information obtained from the broker or

> brokers or attorney or attorneys who negotiated or who are familiar with or cognizant of such sales, which testimony when so offered, shall be competent and admissible evidence in any such action or proceeding.
>
> [N.J.S.A. 2A:83-1.]

Here, the facts and data about the six comparable sale transactions, upon which plaintiff's appraiser's conclusions of value were premised, were not verified, confirmed, or corroborated with any individuals possessing firsthand knowledge of, or a familiarity with those sale transactions. In conducting his comparable sales approach, plaintiff's appraiser relied exclusively on information he gathered from his review of copies of the filed deeds, and public websites, or subscription services.

Whether a sales transaction can be considered a reliable indicator of fair market value depends on an analysis of the following criteria: (i) whether the buyer or the seller were unusually motivated, (ii) whether the buyer and seller were well-advised and acting prudently, (iii) the length of time that the property was exposed to an open and competitive marketplace, (iv) whether the purchase price was paid in cash, and (v) whether the purchase price was affected by special or creative financing. Venture 17, LLC v. Borough of Hasbrouck Heights, 27 N.J. Tax 108, 126 (Tax 2013) (citing Hull Junction Holding Corp., supra, 16 N.J. Tax at 94). This information can only be effectively gathered by interviewing transaction participants, who possess firsthand knowledge regarding the matter. Here, plaintiff's appraiser possessed no information satisfying these fundamental criteria on which to base his analysis and conclusions.

Vital to the accuracy and integrity of the sales comparison approach is that the data is properly sourced, verified and analyzed to ensure its accuracy and to "better understand the attitudes and motivations of the buyer and seller." The Appraisal of Real Estate, supra, at 125. The obligation of an appraiser to collect "accurate, reliable data remains an essential task because the

conclusions of the analyses of appraisers are only as good as the data that supports those conclusions." Id. at 95. An appraiser must verify and analyze the data and its sources to ensure accuracy and to "better understand the attitudes and motivations of the buyer and seller." Id. at 125.

Here, plaintiff's appraiser clearly failed to verify the accuracy and integrity of the facts and data upon which his opinions of value for the subject property were based. The expert did not: (i) contact or consult with any transaction participants to confirm the sale terms; (ii) inquire whether the seller or buyer were unusually motivated by economic factors to dispose of or acquire the property; (iii) ascertain the length of time that the property was exposed to the marketplace; (iv) inquire whether the sale was subject to long-term lease agreements, or were sold vacant, and free of all tenancies; (v) ascertain whether the sale transactions included any unique terms or conditions. Simply stated, plaintiff's appraiser failed to abide by the fundamental tenets of the sales comparison approach and the requirements mandated by our Legislature under N.J.S.A. 2A:83-1.

Additionally, plaintiff's appraiser's adjustments lacked any credible foundation supported by objective data, surveys, or market derived sources. No analysis or explanation was offered by plaintiff's appraiser either, in his appraisal report or in his testimony to the court, supporting his percentage adjustments, or detailing how he arrived at those percentage adjustments. Effective cross-examination disclosed that the expert's adjustments were solely based on his opinions.

It is a well-settled principle that an expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2007) (quoting

State v. Townsend, 186 N.J. 473, 494 (2006)). The opinion of an expert must be supported by a proper foundation and based upon credible facts and data. Peer v. City of Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied, 36 N.J. 300 (1962). N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); Nguyen v. Tama, 298 N.J. Super. 41, 48-49 (App. Div. 1997).

The weight to be accorded expert testimony "depends upon the facts and reasoning which form the basis of the opinion. An expert's conclusion can rise no higher than the data providing the foundation (citation omitted). If the bases for the adjustments are not made evident the court cannot extrapolate value." Inmar Associates v. Edison Township, 2 N.J. Tax 59, 66 (Tax 1980). Thus, in order for the opinion of an expert to be of any value to the trier of fact, the expert is required to "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). "Without explanation as to the basis, the opinion of the expert is entitled to little weight. . ." Dworman v. Tinton Falls Borough, 1 N.J. Tax 445, 458 (Tax 1980) (citing to Passaic v. Gera Mills, 55 N.J. Super. 73 (App. Div. 1959), certif. denied, 30 N.J. 153 (1959)).

Here, the expert's lack of knowledge regarding critical factual details surrounding his comparable sales transactions, which formed the very basis of his opinions, produces an unreliable result. Moreover, plaintiff's appraiser failed to offer any credible explanation or basis for his percentage adjustments that was rooted in objective market data. Consequently, without an adequate understanding of the bases supporting plaintiff's appraiser's adjustments, the court is unable to conclude that they are reasonable.

Thus, because material issues exist as to the accuracy, credibility, and reliability of the expert's sales comparison approach, and for the above stated reasons, the court accords plaintiff's appraiser's sales comparison approach, and the opinions of value derived therefrom, no weight.

d.  The Glen Wall dilemma

Nonetheless, the court is mindful of its obligation "to apply its own judgment to valuation data submitted by experts in order to arrive at a true value and find an assessment for the years in question." Glen Wall Associates v. Wall Twp., 99 N.J. 265, 280 (1985) (citing New Cumberland Corp. v. Roselle Borough, 3 N.J. Tax 345, 353 (Tax 1981)).  However, to enable the court to make an independent finding of true value, credible and competent evidence must be adduced in the trial record.

Here, plaintiff's appraiser's failure to properly verify the integrity and accuracy of the sales data and information renders his conclusions patently unreliable.  Thus, as a result of the inadequacies in plaintiff's appraiser's report and testimony, the court concludes that the record contains insufficient credible evidence to make an independent determination of the true market value of the subject property by a fair preponderance of the evidence.

**III. Conclusion**

For the above stated reasons, the court concludes that plaintiff has failed to prove, by a fair preponderance of the evidence, that the local property tax assessments on the subject property for the 2012, 2013, and 2014 tax years exceed its true value.

Accordingly, the court will enter judgment affirming the assessments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

14