BRENNAN, J.T.C.
This appeal concerns the impact of non-deed restrictions on the value of real property developed as low to moderate income cooperative apartment residences. For the reasons set forth herein, the court finds that the restrictions that created and continue to maintain the cooperative corporation’s real property as a source of low to moderate income housing have resulted in a unique and limited market in which to determine true value. *199 When considering and applying the holdings in Prowitz v. Village of Ridgefield Park, 237 N.J.Super. 435, 568 A.2d 114 (App.Div. 1989), aff'd, 122 N.J. 199, 584 A.2d 782 (1991), and Southbridge Park, Inc. v. Borough of Fort Lee, 4 N.J.Tax 30 (Tax 1981), aff'd, 6 N.J.Tax 351 (App.Div.1984), the court adopts the cooperative sales comparison approach based upon the sales of membership certificates within the cooperative property as the method by which to determine true value.
/. FINDINGS OF FACT AND PROCEDURAL HISTORY
Elizabeth Center Apartments Urban Renewal Corporation (“Taxpayer”) contests the 2006 and 2007 real property tax assessment on a low to moderate income cooperative[1] apartment complex located in the City of Elizabeth (“City”) at 735-821 Pearl Street and shown as Block 6, Lot 860 on the tax map of the taxing district (“Subject Property”).
The assessment for both tax years is:
Land $ 400,000
Improvements $ 900,000
Total $1,300,000
The Taxpayer timely appealed the 2006 and 2007 assessments directly to the Tax Court pursuant to N.J.S.A. 54:3-21.
The Subject Property consists of 4.65 acres and is comprised of three five-story brick apartment buildings and one twelve-story brick apartment building. Combined, these buildings contain a total of 260 apartment units. Each five-story building has ten three-bedroom units, twenty two-bedroom units and twenty one-bedroom units. The twelve-story building has twenty-two two-bedroom units and eighty-eight one-bedroom units.
*200 The Taxpayer is a not-for-profit cooperative housing corporation organized for the sole purpose of providing low and moderate income housing pursuant to the requirements of the National Housing Act, 12 U.S.C.A. § 1701-1750g. The Taxpayer purchased the property in 1966 and formed a restrictive Regulatory Agreement, By-Laws and Articles of Incorporation in accordance with the requirements of the Federal Housing Administration (“FHA”). The Taxpayer secured a loan from the Department of Housing and Urban Development (“HUD”) in the amount of $4,670,300 to construct the improvements on the property. Since that time, the Subject Property has been managed exclusively to benefit low and moderate income individuals and families as determined by the rules and regulations promulgated by the FHA and HUD, pursuant to the authority granted to them by the National Housing Act.
In exchange for financing, the FHA and HUD provide federal oversight and guidance as to all of the Taxpayer’s operations. The Commissioner of the FHA must approve all management and operating decisions, including budgetary approval. The contract between the FHA and the Taxpayer is the Regulatory Agreement. As long as the agreement remains in effect, Section 5(e) of the Regulatory Agreement prohibits amendment of the By-Laws or Certificate of Incorporation without the written permission of the FHA. Due to this provision, Section 23 of the Regulatory Agreement states that the covenants and agreements between the Taxpayer and the FHA run with the land so long as there is a mortgage on the Subject Property that is either insured or owned by HUD.[2]
The purchase price of a membership certificate representing the right to a single housing unit was established in 1966 and, through the By-Laws and other restrictions imposed by the FHA and HUD, the value of a membership certificate essentially remains the same upon subsequent sale. The sale price of a certificate is *201 determined by a formula described in the By-Laws and the Regulatory Agreement. A member builds equity by paying down the mortgage principal and is able to recoup costs for approved improvements made to the unit, but the membership certificate will never appreciate in market value and no member will profit upon its subsequent sale.
At the time of its creation in 1966, the original Taxpayer members were derived from a pool of applicants. All applicants, then and to the present day, must meet annual income limitations established by HUD.[3] In addition, the occupants are subject to annual income verification. Each unit must be owner-occupied; the units may not be sublet or leased. HUD may approve or reject any applicant based on the described regulations.
Section 13 of the Regulatory Agreement refers to the Taxpayer’s By-Laws with respect to the sale of a membership:
[A]ny membership shall be sold by the Mortgagor or by a member only in the manner and for the amount as provided in the By-Laws, and that to this end a sale by a member shall be supported by a certification by the seller and the purchaser as to the amount of the sales price not in excess of that permitted by the By-Laws.
The By-Laws also provide for restrictions regarding who can purchase a departing member’s share. Article III, Section 8(b) of the By-Laws gives the Taxpayer the right of first refusal.[4] If the Taxpayer exercises this right, Article III, Section 8(d) of the ByLaws restricts the sales price of the membership share (unit) as follows:
Transfer Value. Whenever the Board of Trustees elects to purchase a membership, the term “transfer value” shall mean the following:
(1) The consideration (i.e. down payment) paid for the membership by the first occupant of the unit involved as shown on the books of the Corporation;
*202 (2) The value, as determined by the Trustees, of any improvements installed at the expense of the member with the prior approval of the Trustees, under a valuation formula which does not provide for reimbursement in an amount in excess of the typical initial cost of the improvements; and
(3) The amount of principal amortized by the Corporation on its mortgage indebtedness and attributable to the dwelling unit involved as paid by the member involved and previous holders of the same membership. However the amount of principal paid by the Corporation for a period of three (3) years after the Corporation has made its first principal payment on the mortgage shall not be included in this computation.
Should the Taxpayer choose not to purchase the membership certificate, the sale price of the membership certificate is still limited by Article III, Section 10 of the By-Laws, which states that the member may only sell the membership to a person approved of by the Board of Trustees and that the sales price may not exceed the transfer value defined in Article III, Section 3(d).
The above-referenced restriction prohibits the computation of a purchase price based on market forces. During the relevant time period, the purchase price of a membership certificate ranged from $11,304 to $19,782, depending on how many bedrooms the unit had and if there was a balcony.
According to the 2005 Elizabeth Master Plan, the City has included the Subject Property as part of its official low-income housing stock.

II. THE TESTIMONY OF THE APPRAISERS

To assist the court in this appeal, both the Taxpayer and the City engaged the services of professional real estate appraisers to provide opinions of value of the Subject Property for the tax years in dispute. Each appraiser, without objection, was accepted by the court to testify as an expert witness and prepared a valuation report that was admitted into evidence pursuant to R. 8:6-1(b). The experts agreed that the highest and best use[5] of the Subject Property, as improved, is its current use. The experts also agreed *203 that the accepted appraisal method when valuing a cooperative apartment complex is generally the subject comparable sales approach. Due to the restrictions limiting the sales price of a membership certificate at the Subject Property, the experts disagreed as to whether the subject comparable sales approach was applicable in this instance. The experts also disagreed on what weight, if any, to give the restrictions when determining the property’s true value.
A. THE TAXPAYER’S EXPERT
The Taxpayer argues that the current assessment does not properly account for the restrictions imposed on the Subject Property and advocates that the court should evaluate the property as its own market. At trial, the Taxpayer’s expert supported this position by testifying as to his application of two variations of the sales comparison approach.
The first sales comparison approach used twenty-eight sales prices at the Subject Property, combined with the outstanding mortgage debt, to reach a conclusion of value. This approach to the valuation of cooperative apartments was explored and approved of in Southbridge Park Both experts stated during trial that the Southbridge Park approach is the generally accepted method by which to appraise cooperative apartment complexes in New Jersey. Due to the restrictions in place at the Subject Property, these sales were depressed in value compared to sales in an open market. The Taxpayer’s expert reached a conclusion as to property value of $5,222,065 for 2006 and $5,364,484 for 2007.
Taxpayer’s expert’s second approach valued the property using the standard sales comparison approach. Under this approach, he used sales from the Subject Property and market sales of condominium units adjusted to account for the restrictions on the Subject Property. The Taxpayer’s expert reached a conclusion as to property value of $4,382,315 in 2006 and $4,468,384 in 2007 (values that are lower than those calculated in his first approach). He questioned these calculations as demonstrative of true value because he believed that the comparable properties were too *204 significantly dissimilar from the Subject Property to represent the “true value” of the Subject Property.
The Taxpayer’s expert further testified that identifying comparable sales was problematic because not only is there a limited number of cooperatives in New Jersey, but he could find only one similarly restricted cooperative building in the state. Additionally, he did not believe that this restricted cooperative was a true comparable property because the restrictions on the values of its shares were tied to the Consumer Price Index. For this reason, he opined that the greatest weight should be given to the 28 Subject Property sales within the relevant assessing timeframe using the market sales approach approved of in Southbridge Park.
While acknowledging that the cooperative in Southbridge Park was unrestricted, the Taxpayer’s expert opines that this is still the preferred valuation method for a restricted cooperative because the restrictions result in the need to treat the Subject Property as its own unique market.[6] In support of his limited market argument, the Taxpayer’s expert notes that there are no private parties negotiating a purchase price, as the purchase price is restricted with no margin for profit. Additionally, he points out that there is no pool of buyers from a free market because the low to moderate income criteria established by the federal government in the Taxpayer’s Regulatory Agreement, By-Laws and Certificate of Incorporation creates a limited market of buyers who may be accepted.
*205 The Taxpayer’s expert did not determine the value of the Subject Property without restrictions.
B. THE CITY’S EXPERT
The City argues that the approach used in Southbridge Park is not appropriate for the Subject Property because the restrictions on the sales price are based solely on the contractual nature of ownership and not on a more permanent deed restriction. The City maintains that the restrictions are voluntarily owner-imposed and are therefore distinguishable from deed restrictions because they can be eliminated by paying off the mortgage.
The City’s expert appraised the Subject Property using two separate and distinct approaches. First, at the direction of the attorney for the City, the City’s expert estimated the market value of the Subject Property as if it was a rental property by applying an income capitalization approach using direct capitalization.[7] The City’s expert arrived at a value of $15,800,000 for 2006 and $17,000,000 for 2007. At trial, he testified that while he put more weight on this approach, he would not have used an income analysis for the valuation of the Subject Property but for the request of the City’s attorney.[8] The City’s expert also testified that when appraising cooperative apartments he typically does not use the income approach.
The second valuation approach utilized by the City’s expert applied the subject sales comparison approach for a restricted cooperative as approved in Southbridge Park (the same approach employed by the Taxpayer’s expert). He testified that this is the *206 approach typically accepted by appraisers and the Tax Court when determining the value of a cooperative apartment complex. Not surprisingly, the City’s expert came to the same value for 2006 and 2007 as the Taxpayer’s expert when using this approach.
Although the City’s expert agreed that the Southbridge Park method is the generally accepted method of appraising cooperative apartments and that his mathematical calculations were the same as Taxpayer’s expert under this method, he unequivocally disagreed that this was the correct approach to determine true value for the Subject Property. In his view, the Southbridge Park approach is distinguishable because the cooperative corporation in that case functioned in an unrestricted market. In the present matter, the City’s expert stated “the control of the real estate value ... is in the hands of the owner, as opposed to the market place.” While acknowledging that the restrictions imposed on the Taxpayer limit the purchase price of a member’s share, his point of contention was that the restrictions are not recorded on the deed. He therefore argued that the restrictions are in place due to the Taxpayer’s choice and can be removed at any time the HUD mortgage is paid off.
During his testimony at trial, the City’s expert did not actually provide the court with his recommendation for the determination of value. He did, however, make the following statement:
And it’s very unusual in my experience to have a facility like this, but this is unique, because it was intended to serve a public interest value since day one. It was built to accommodate the affordable housing requirement in Elizabeth for— back in 1966, it continues to serve that need.

III. CONCLUSIONS OF LAW

It is well established that all real property must be “assessed according to the same standard of value____” N.J. Const. art. VIII, § 1, ¶1. The standard of value is true value, N.J.S.A. 54:4-2.25, which has been defined by our Supreme Court as “the consideration of the market value of the property at a fair and bona fide sale at private contract. True value of property of any kind is in essence the value it has in exchange for money.” City of Newark v. Township of West Milford, 9 N.J. 295, 303, 88 *207 A.2d 211 (1952) (citing Hackensack Water Co. v. Division of Tax Appeals, 2 N.J. 157, 163, 65 A.2d 828 (1949)). The assessor is statutorily required to “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract....” N.J.S.A. 54:4-23.
On appeal, a municipality’s original tax assessment is entitled to a presumption of validity. E.g., Pantasote Co. v. City of Passaic, supra, 100 N.J. at 412, 495 A.2d 1308; Aetna Life Ins. Co. v. City of Newark, 10 N.J. 99, 104-105, 89 A.2d 385 (1952). In Pantasote Co. v. City of Passaic, supra, our Supreme Court stated:
The presumption attaches to the quantum of the tax assessment. Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has been long settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be “definite, positive and certain in quality and quantity to overcome the presumption.”
[100 N.J. at 413, 495 A.2d 1308 (citations omitted).]
In Aetna Life Insurance Co., supra, the Supreme Court explained the presumption in favor of an assessment and set forth the standard of review for tax assessments:
The settled rule is that there is a presumption that an assessment made by the proper authority is correct and the burden of proof is on the taxpayer to show otherwise. And the taxpayer has not met this burden unless he has presented ... sufficient competent evidence to overcome the presumption, that is, to establish a trae valuation of the property at variance with the assessment. In other words, it is not sufficient for the taxpayer merely to introduce evidence: the presumption stands until sufficient competent evidence is adduced to prove a true valuation different from the assessment. Such evidence must be definite, positive and certain in quality and quantity to overcome the presumption.
[10 N.J. at 105, 89 A.2d 385 (citations omitted).]
This presumption does not only serve as a means to allocate the burden of proof. It is “a construct that expresses the view that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law.” Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308 (citation omitted).
*208 “The presumption of correctness ... stands, until sufficient competent evidence to the contrary is adduced.” Township of Little Egg Harbor v. Bonsangue, 316 N.J.Super. 271, 285-286, 720 A.2d 369 (App.Div.1998) (citation omitted). When examining whether the presumption has been overcome, the evidence should be analyzed “as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion.” MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N. J.Tax 364, 377 (Tax 1998). To overcome the presumption, the evidence presented “must be ‘sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.’ ” West Colonial Enters., LLC v. City of East Orange, 20 N.J.Tax 576, 579 (Tax 2003) (quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J.Tax 405, 408 (Tax 1999), aff'd, 18 N.J.Tax 658 (App.Div.), certif. denied, 165 N.J. 488, 758 A.2d 647 (2000)), aff'd, 21 N.J.Tax 590 (App.Div. 2004).
The court finds that the Taxpayer presented sufficient evidence to overcome the presumption of validity attached to the City’s original tax assessment. Both the Taxpayer and the City’s expert acknowledged that the Subject Property as restricted is a market in and of itself. In addition, the court is satisfied that the true value of the property must reflect the restrictions which limit the market value of the units. The court finds that the current assessment of $1,300,000 creates a question regarding the correctness of the assessment sufficient to permit the court to make an independent determination as to the value of the Subject Property.[9]
*209 Simply overcoming the presumption does not require the court to enter a judgment in favor of the complaining party. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 312, 604 A.2d 580 (1992) (quoting Pennwalt Corp. v. Township of Holmdel, 4 N.J.Tax 51, 55-56 (Tax 1982)). Once sufficient evidence is submitted and the court finds the presumption has been overcome, the Tax Court must “appraise the testimony, make a determination of true value, and fix the assessment.” Rodwood Gardens, Inc. v. City of Summit, 188 N.J.Super. 34, 38, 455 A.2d 1136 (App.Div.1982). The court must consider the “evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence.” Ford Motor Co., supra, 127 N.J. at 312, 604 A.2d 580 (citing Pennwalt Corp., supra, 4 N.J.Tax at 55). “[Although there may have been enough evidence to overcome the presumption of correctness at the close of plaintiffs case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case ... to demonstrate that the judgment under review was incorrect.” Ford Motor Co., supra, 127 N.J. at 314-315, 604 A.2d 580 (citing Pantasote, supra, 100 N.J. at 413, 495 A.2d 1308).
As previously stated, the valuation approach to be used when assessing a cooperative apartment complex was explored in Southbridge Park, supra, 4 N.J.Tax 30. The court, while taking into consideration the requirement that all property must be assessed at the same standard of value, determined that there could be no rigid rule in the search for the fair value of property. Id. at 33-34. Recognizing that a cooperative building is unlikely to ever be sold as one unit, the court acknowledged that the combined values of the individual proprietary leases produced a value substantially different from the building’s market value as a non-cooperative rental unit. Id. at 34.
The Southbridge Park court rejected valuation of a cooperative on an income basis because the property was being utilized as the residence of shareholders owning proprietary leases, not as invest *210 ment income. Id. at 35. The court concluded that the owners were not purchasing their interest for income-producing purposes and that to compute a value through the income approach would result in determining a value that would not reflect the true value of the property. Ibid. The court further noted:
Having concluded that the income method of valuation does not reflect market value, the only remaining question is to determine what weight should be given to the market sales of the various propriety leases.
Equally applicable would be the use of market sales of the component parts of the subject property. While it is recognized that the form of that which is purchased and sold by the tenants of a cooperative apartment building is stock and a proprietary lease, the substance is the right to occupy, with maximum incidents of ownership, a specific apartment. In matters of taxation, substance must prevail overfmm.
[Id. at 36 (emphasis added).]
Having rejected the income approach, the Southbridge Park court considered a market sales approach. Id. at 36-37. The Appellate Division has described this approach as “[ujnder the market or comparable sales approach to valuation, comparable properties are analyzed and adjusted for variables. Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties to admit of reasonable comparison.” Glenpointe Assocs. v. Township of Teaneck, 241 N.J.Super. 37, 48, 574 A.2d 459 (App.Div.) (citations omitted), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990).
The search for comparable sales most similar to the Subject Property was a problem that both expert appraisers acknowledged. While the Subject Property gives the appearance of a typical urban multi-family residential property, the restrictions that govern sales distinguish it from those comparables. With a lack of comparable outside sales, the focus then shifts to sales within the Subject Property. There were 28 such sales within the period of assessment and these were the source of the computed values presented by the appraisers using the Southbridge Park approach. However, the difference is that, unlike in Southbridge Park, the Subject Property’s restrictions prohibit a negotiated purchase price based on market forces.
*211 The court must consider the impact of the affordable housing restrictions on the valuation approach to be adopted and the weight that those restrictions are to have when ascertaining true value. Fortunately, New Jersey case law contains guidance as to how these restrictions are to be viewed when determining valuation.
In Prowitz v. Village of Ridgefield Park, supra, the Appellate Division addressed whether the property assessment of a single-family residential unit, which comprised a portion of the municipality’s official affordable housing stock, must consider a deed restriction that limits the unit’s resale value to its initial purchase price plus Consumer Price Index increases in order to ensure the unit’s continuing status as affordable housing. 237 N.J.Super, at 437, 568 A.2d 114. The Prowitz court held that “while the maximum resale price obtainable under the deed restriction does not necessarily define assessable value, the resale restriction nevertheless is a factor that must be considered in fixing the assessment.” Id. at 439, 568 A.2d 114. This court finds that the same holds true for the Taxpayer in the present matter. While individual Taxpayer members are enjoying home ownership at below-market financing, they do so without the ability to make a profit at the time of sale. This in turn helps to perpetuate the City’s low to moderate income housing stock.
The rationale of the Prowitz opinion was stated concisely and articulately and thus bears repeating:
We ... deem the restriction here analogous to value-depreciating government regulation. Thus the provision of a fair share of affordable housing is, by reason of the Fair Housing Act, a municipal obligation imposed by statute, and the perpetuation of that stock by resale restrictions is a matter of implementing COAH regulation. The restriction here, to be sure, antedates COAH, but the municipal obligation had already been defined by Mount Laurel, and it was in evident fulfillment of the Mount Laurel obligation that the Authority, HDC and Ridgefield Park proceeded with these projects.
We note, moreover, the conceptual similarity between the deed restriction here and the protective statute the Tax Court addressed in Schwam v. Cedar Grove Tp., supra [9 N.J.Tax 406 (Tax 1987) ]. In both, the market value of the property, that is, the amount which a bona fide buyer would otherwise pay a bona fide seller in an arms-length transaction, is significantly affected by governmental action taken for the beneficent public purpose of advancing and protecting the housing needs of classes of persons legislatively determined to require housing assistance. The form *212 of that assistance here relevant is the imposition of a value-depreciating burden upon private ownership. That direct burden is justified on the basis of paramount public policy. It is fundamentally fair then for the public to share that burden with private ownership at least to the extent of recognizing, for tax assessment purposes, the market-place consequences of the restriction. We agree with the observation of Judge Crabtree in Scliwam ... that there is an apparent element of injustice in imposing an onus on municipal taxpayers that ensures to the benefit of the State as a whole. But that is the consequence of the Legislature having made no specific provision for the allocation of the ensuing tax burden between local and State government. It is also, of course, a consequence of the nature of this State’s real property tax base. But these are not matters before us or which the judiciary has a present competence to correct.
[Id. at 443-444, 568 A.2d 114 (citations omitted).]
Although the Promtz decision involved a deed-restricted property, this court does not interpret that decision to exclude the non-deed restrictions imposed on the Taxpayer.
The judicial ability of a court to determine the appropriate method of valuing real property was recognized by our Supreme Court in Hackensack Water Co. v. Borough of Old Tappan, 77 N.J. 208, 390 A.2d 122 (1978). While acknowledging the different standards of valuation used to determine the value of a property in a free market, the Court held that the standard techniques were incompatible with the unique problems posed. Id. at 215, 390 A.2d 122.
In the present matter, the restrictions imposed upon the resale price of a membership certifícate at the Subject Property are at odds with the concept of market value based upon a fair and bona fide sale by private contract. For reasons associated with public policy, the full and fair value of a Taxpayer membership certificate is artificially depressed by the limitations imposed on the sale of a member’s share as dictated by Article III, Section 8(d) of the ByLaws, unlike properties available in a free market. The court finds that this situation has created a limited and unique market in which to determine the Subject Property’s true value. The court also finds no plausible reason to deviate from the accepted method of appraisal for cooperative apartments as determined in South-bridge Park.

*213
IV. CONCLUSION OF VALUE

N.J.S.A 54:1-35a and N.J.S.A 54:3-22 together are commonly referred to as Chapter 123. Chapter 123 “provides a statutory formula for determining whether an assessment is discriminatory; that is, whether the ratio of assessment to true value of a property substantially exceeds the ratio generally prevailing in a taxing district.” North Brunswick Township v. Gochal, 27 N.J.Tax 31, 33 (Tax 2012). “[A] taxpayer’s right to relief should be determined in accordance with Chapter 123 in all but the most extreme or severe circumstances.” Murnick v. City of Asbury Park, 95 N.J. 452, 463, 471 A.2d 1196 (1984).
“Average ratio” is defined as the ratio of “assessed to true value of real property for a taxing district ... promulgated by the Director of the Division of Taxation ... as of October 1 of the year preceding the tax year, as revised by the tax court.” N.J.S.A. 54:1-35a(a). The “common level range” for a taxing district is defined as the “range that is plus or minus 15% of the average ratio for that district.” N.J.S.A 54:1-35a(b).
The Tax Court’s authority to revise an assessment is prescribed by N.J.S.A. 54:51A-6, which requires the court to revise the taxable value of a property if its ratio of its assessed value to its true value exceeds the common level range. The taxable value will be revised by applying the average ratio to the true value of the property. Ibid. The statute provides no authority for revision of the taxable value when the ratio of the assessment to true value is within the common level range.
The average ratio for the City for tax year 2006 is 13.21%, with a common level range of 11.22% to 15.19%. The City’s 2007 average ratio is 10.98%, with a common level range of 9.33% to 12.63%.
The court finds that the true value of the Subject Property is $5,222,065 for 2006 and 5,364,484 for 2007, as calculated using the Southbridge Park approach. The ratio of the assessed to true value is therefore:
*214 2006 1,300,000 = .2489 or 24.89%
5,222,065
2007 1,300,000 = .2423 or 24.23%
5,364,484
Since in both tax years at issue the assessment to true value ratios exceed the upper limits of the common ranges, the assessment for each year shall be adjusted as follows:
2006 5,222,065 x .1321 = $689,835 ($690,000)
2007 5,364,484 x .1098 = $589,020 ($590,000)

V. CONCLUSION

For the reasons set forth above, the court accepts the true value of the Subject Property to be $5,222,065 for 2006 and $5,364,484 for 2007, as so concluded by both appraisal experts when applying the Southbridge Park approach. The assessment for each tax year shall be reduced as follows:
2006:
Land $400,000
Improvements $290,000
Total $690,000
2007:
Land $400,000
Improvements $190,000
Total $590,000
The Tax Court Clerk/Administrator shall enter judgment consistent with this opinion.

 A cooperative is a "form of ownership in which each owner of stock ... receives a proprietary lease on a specific apartment and is obligated to pay a monthly maintenance charge that represents the proportionate share of operating expenses and debt service on the underlying mortgage, which is paid by the corporation.” Appraisal Institute, The Appraisal of Real Estate 127 (13th ed.2008).

 The Cooperative Recording Act of New Jersey, which authorizes the filing of organizational documents for cooperative apartments, did not become effective until 1988. N.J.S.A. 46:8D-1 to -18. Accordingly, no restricted Master Deed could have been filed at the time the Taxpayer was formed.

 The income limits for the years in question were $48,200 for one person, $55,100 for two persons, $62,000 for three persons and $68,900 for four persons.

 At trial, the President of the Taxpayer’s Board of Trustees testified that the Taxpayer has always exercised this option and that there is typically a waiting list for memberships. In the event that the Taxpayer should fail to exercise the right of first refusal, the departing member can only sell its membership share to an individual approved by the Taxpayer, pursuant to the limitations as described above.

 Highest and best use is defined as the "reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, financially feasible, and that results in the highest value.” Appraisal Institute, The Dictionary of Real Estate Appraisal 93 (5th ed.2010).

 The parties previously litigated tax appeals for years 2003, 2004 and 2005. At the conclusion of trial for those years, the tax court found that the sales approach taken by the Taxpayer was inappropriate because it failed to take into account comparables from similarly situated properties and that the Taxpayer did not overcome the presumption of correctness for municipal assessments as set forth in Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-14, 495 A.2d 1308 (1985). Elizabeth Center Apartments v. City of Elizabeth, Docket Nos. 003676-2003, 002672-2004, 000289-2005, at *10 (Tax Jan. 19, 2007). A footnote of the court’s unpublished decision states that the Taxpayer suggested the Subject Property was a market unto itself but failed to develop this as an actual argument and failed to offer any corresponding evidentiaiy support. Id. at *9 n. 10. On appeal, the Appellate Division affirmed the tax court’s decision. Elizabeth Ctr. Apts. v. City of Elizabeth, 2007 WL 4355517, 2007 N.J.Super. Unpub. LEXIS 1364, (App.Div. Dec. 14, 2007).

 The direct capitalization method converts an estimate of a single year's income expectancy into an indication of value. Appraisal Institute, The Appraisal of Real Estate 499 (13th ed.2008).

 In his report, the City’s expert stated that the two approaches he used to determine value were at the "legal instruction" of the City's counsel. The City's expert did not, however, advocate either approach. Rather, he put more weight on the income approach because he believed the sales approach was flawed as a result of the transfer value being regulated by contractual provisions that do not reflect market influence.

 The Taxpayer's expert opined the market value of the Subject Property was $5,222,065 for 2006 and $5,364,484 for 2007. Equalized value is the property's assessed value divided by the City’s average ratio. The Subject Property's equalized value is $9,841,030 for 2006 ($1,300,000 .1321 = $9,841,030) and $11,839,709 for 2007 ($1,300,000 4- .1098 = $11,839,709). The opinion of the Taxpayer’s expert thus supports a conclusion that the Subject Properly has been *209 assessed in excess of its true value for the years at issue and that the Taxpayer is entitled to relief.