NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Patrick DeAlmeida**
 **Presiding Judge**

R.J. Hughes Justice Complex
P.O. Box 975
25 Market Street
Trenton, New Jersey 08625-0975
(609) 815-2922 x54620

January 2, 2018

Michael P. O'Grodnick, Esq.
Savo, Schalk, Gillespie, O'Grodnick & Fisher, P.A.
77 North Bridge Street
Somerville, New Jersey 08876

Gregory B. Pasquale, Esq.
Jose Rivera-Benitez, Esq.
Shain Schaffer, P.C.
150 Morristown Road, Suite 105
Bernardsville, New Jersey 07924

> Re: The Senior Citizens Center of the Ukrainian
> Orthodox Church of St. Volodimir v.
> Township of Franklin
> Docket No. 014516-2010
> Docket No. 006806-2011
> Docket No. 014852-2012
> Docket No. 003675-2013
> Docket No. 006423-2014
> Docket No. 007971-2015
> Docket No. 006605-2016

Dear Counsel:

This is the court's opinion after trial in the above-referenced matters challenging the local

property tax assessments on real property for tax years 2010 through 2016. For the reasons stated

more fully below, the assessments are affirmed.

## I. Procedural History and Findings of Fact

The following findings of fact and conclusions of law are based on the evidence and testimony admitted at trial.

These appeals concern local property tax assessments on real property in defendant Franklin Township, Somerset County. The subject property is designated in the records of the municipality as Block 424.02, Lot 11.238, and is commonly known as 66 Cedar Grove Lane.

There are five buildings containing 56 residential units, and related site improvements on the subject property. The complex, known as the Ukrainian Village, consists of 24 one-bedroom units of approximately 790 square feet, 24 two-bedroom units of approximately 1,090 square feet, and 8 one-bedroom efficiency units of approximately 700 square feet. The residential units are in average condition. The improvements, constructed from 1981 to 1990, include on-site laundry facilities, and sufficient parking. A pipeline easement runs along an edge of the property on the opposite side of the parcel's frontage on Cedar Grove Lane. A portion of the parking lot is situated on the pipeline easement.

The buildings and improvements were constructed prior to the tax years at issue by the Ukrainian Autocephalic Orthodox Church of St. Volodimir, Inc. ("the Church"). At the time of the construction of those units, the subject property was part of a larger parcel owned by the Church for which the Franklin Township Zoning Board of Adjustment approved a use variance permitting the construction of 60 residential units for persons 55 years and older. Although plaintiff contends that the Zoning Board of Adjustment resolution also requires that the residential units be occupied by members of the Church or people of Ukrainian descent, there is no language creating such restrictions in the board's resolution. Moreover, the constitutionality of any such restrictions

2

would be questionable.  See Taxpayers Ass'n of Weymouth Twp., Inc. v. Township of Weymouth, 80 N.J. 6 (1979)(discussing equal protection limitations on zoning powers).[1]

The township Zoning Officer credibly testified that although the Zoning Board of Adjustment noted in the preamble to its use variance resolution that the Church intended to use the residential units to house its adherents, the board did not include that intended use as a government-sanctioned restriction to its approval.  This testimony is corroborated by the language of the resolution, which conditions approval only on the use of the residences on the subject property by "senior citizens."  Additionally, there is no suggestion in the evidence that the municipality imposed an income restriction on residents of the subject property.

After construction of 56 units (it is not clear why four of the approved units were not built), the Church and a number of residents at the subject property became embroiled in litigation regarding, among other things, responsibility for the repair and maintenance of the improvements.  As part of the settlement of the litigation, in 2002, the subject parcel, consisting of 12.72 acres, was created by subdivision from the larger lot.  As a result of the subdivision, the subject property enjoys the benefit of an access road and utilities easement across the remainder of the larger parcel owned by the Church.  The easement inures to the benefit of any successor owner of the subject property, subject to approval by the Church.  There is no site improvement on the subject property providing direct access to Cedar Grove Lane.

---

[1]     The rules and regulations of the Ukrainian Village provide that the township "approved the construction of this development with the understanding that only individuals of a senior age would be residing in the development" and does not indicate that the township imposed a religious or national origin limitation on residency.

Although plaintiff offered two witnesses who testified that the easement is the only possible means of accessing Cedar Grove Lane from the subject, their testimony is contradicted by other evidence in the record. The subject property has frontage on Cedar Grove Lane. It is not at all clear that, in the event that the Church refused to approve transfer of the easement to a purchaser of the subject property, an access road could not be constructed on the subject property to Cedar Grove Lane. Plaintiff's expert testified that any access road from the subject to Cedar Grove Lane would have to cross the pipeline easement. This testimony was demonstrated to be incorrect, as the pipeline easement runs along the rear of the subject property far from Cedar Grove Lane. That witness also testified that the presence of wetlands along the property's frontage with Cedar Grove Lane would prevent construction of an access road on the property. The witness offered no evidence to corroborate this statement, and the record contains no evidence of the presence or location of wetlands on the subject property.

At the time of the subdivision, title to the subject property was transferred from the Church to plaintiff Senior Citizen Center of the Ukrainian Orthodox Church of St. Volodimir ("SCC, LP"), a for-profit limited partnership. Plaintiff's Limited Partnership Certificate describes its business purpose as:

> to (a) provide, maintain, lease, construct, sell, or buy senior citizen residential housing units in Franklin Township, Somerset County, State of New Jersey, to be occupied by individuals: (i) who are at least 55 years old, or such other age, as may be determined by the General Partner of the Limited Partnership from time to time, (ii) who are also members and/or shareholders of any of the General Partners of the Limited Partnership, and (iii) who are also limited partners of the Limited Partnership; (b) to build and maintain supporting facilities and structures at the housing units and surrounding premises occupied by these individuals; and/or (c) to carry out, and be engaged in, any and all other activities permitted to be engaged in or carried out, by limited partnerships in the State of New Jersey.

4

This document also provides that all profits of the limited partnership will be allocated among the partners.

The general partner of SCC, LP is the similarly named Ukrainian Orthodox Church of St. Volodimir Senior Citizen Association ("SCA, GP"), a non-profit corporation. All of the residents at the property at the time of the subdivision were members of SCA, GP and became limited partners in SCC, LP, giving them full control of the limited partnership that owns the subject property.

Residents at the subject property do not own the units in which they live. Instead, the right to use, occupy, and reside in a unit is granted in a certificate of rights and interests issued by SCA, GP, a membership certificate issued by SCA, GP, and a membership certificate issued by SCC, LP. These certificates also grant the holder access to all common areas of the subject property. These rights may be held only for the purpose of the owner residing in a unit, and not as an investment. The holder of the right to occupy a unit may not rent that unit to another person. The subject property is not owned as a co-operative or a condominium and the certificate of rights and interests issued by SCA, GP expressly provides that the certificate holder does not hold any ownership interest in the subject property, apart from those described above.

The certificate of rights and interests issued by SCC, LP describes limitations on its sale. According to the certificate, any assignment, sale or transfer must comply with the terms, conditions, and restrictions set forth in the certificate of membership in SCC, LP, and the certifications of incorporation of SCC, LP, and of SCA, GP, as well as the by-laws of SCA, GP, the SCC LP agreement, and any rules and regulations of those entities. In addition,

> [a]t lease one individual to whom such rights and interests are assigned or transferred of record, must be of Ukrainian descent or extraction and must satisfy the minimum age requirement

established by the General Partner.  No children under the age of 18 may reside on a permanent basis at the building unit.

The rules and regulations of the Ukrainian Village also describes limitations on the transfer of the right to occupy a unit at the subject.  That document lists only the 55 and older age restriction, and the prohibition on children residing at the subject property.  The document contains no indication that the holder of a right to reside at the subject must be of Ukrainian descent or an adherent of the Church.[2]

Certificate holders do not pay rent.  They instead pay monthly maintenance fees and any assessments established by SCA, GP from time to time.  The monthly charges cover the cost of operating the subject property, including the maintenance of a reserve for capital improvements and repairs.  An apportioned share of local property taxes are included in the monthly charges.  In the event that a resident does not pay monthly charges, as sometimes happens when a resident's partnership interests pass to an estate upon the death of the resident, SCA, GP recovers the monthly charge arrearages at the time that the resident's partnership interests are transferred to a new owner.

The right to occupy a residential unit at the subject property generally is not offered on the open market.  Typically, an owner interested in selling his or her right to occupy a unit relies on "word of mouth" in the Ukrainian community, and may advertise in newspapers directed at that community.  A prospective purchaser must be presented to the Board of Directors of SCA, GP for consideration.  That body has the authority to approve the potential purchaser, presumably based on a determination that the potential purchaser is 55 or older, and meets other requirements set

---

[2] Although a witness called by plaintiff, an attorney who drafted many of the legal documents establishing the ownership structure of the subject property, repeatedly testified that only members of the Church may purchase the right to reside in a unit, no document was entered into evidence setting forth such a limitation.

forth in the relevant certificates, by-laws, agreements, and rules and regulations. In addition, according to the rules and regulations of the Ukrainian Village, SCC, LP, and every member of SCC, LP, has the right of first refusal to purchase the right to reside in the unit, at a price at least equal to or more than offered by any prospective purchaser.[3]

Once the board approves a potential purchaser, the seller and purchaser negotiate a selling price for the certificates that grant the right to occupy a unit. Although a witness for plaintiff testified that SCA, GP does not receive any funds as a result of the sale of such rights, with all proceeds going to the seller, the by-laws of SCA, GP contradict that testimony and plainly provide that when a resident sells his or her interests SCA, GP is entitled to a "flip tax" of 5% of the "net profits," if any, from the sale. Summary Statements of Receipts and Disbursements for plaintiff admitted into evidence show income from the "flip tax" for two years.

The SCA, GP by-laws authorize the general partnership to sell the subject property, on the recommendation of the Board of Trustees of the general partnership, and with a 2/3 vote of the members of the general partnership. Thus, a 2/3 majority of the residents of the subject property could elect to sell the property. Presumably, the proceeds of such a sale would go to the limited partners of SCC, LP and to SCA, GP pursuant to whatever terms exist in the limited partnership agreement that controls SCC, LP. Also, from a practical perspective, any purchaser of the subject property would seek to secure approval of the Church for a transfer from SCC, LP to the purchaser of the road and utilities easement that crosses the Church's adjoining property, although a potential

---

[3] A resident of the subject property who served as an officer of SCA, GP testified that the general partnership "usually" approves only prospective purchasers who are members of the Church, or a related Church, because that is what is "expected." The record contains conflicting testimony with respect to whether a resident who leaves the Church would be compelled to sell his or her interests in the partnerships and vacate the subject property.

purchaser might be able to construct an access road on the subject property in the event that the Church refused to agree to a transfer of the easement.

For each of the tax years at issue here, 2010 through 2016, inclusive, the subject property was assessed as follows:

| | |
|---|---|
| Land | $2,240,000 |
| Improvement | $2,800,000 |
| Total | $5,040,000 |

Because the municipality conducts an annual district-wide reassessment, the average ratio for each tax year is presumed to be 100% and the assessments are presumed to reflect true market value. See N.J.S.A. 54:1-35a.

The municipal tax assessor testified that he visited the site, spoke with management, and determined the tax year 2010 assessment based on an income-approach for an age-restricted garden apartment complex. He testified that the over-55 market in Franklin Township was "booming" at the time that he determined the tax year 2010 assessment. The assessor credibly testified that the tax year 2010 assessment was determined as part of a municipal-wide reassessment with the approval of the Somerset County Board of Taxation, and the Division of Taxation. A reassessment program requires a change in at least 50% of the property line items.

The tax year 2010 assessment represented a slight decrease in the assessment placed on the property for tax year 2009. The tax year 2009 assessment was part of a reassessment implemented three years after the prior assessment was determined. The tax year 2009 assessment represented a significant increase over the prior assessment. The tax assessor testified that the tax year 2009 increase was the result, in part, of a change in the classification of the property from 1-to-4 family residential to apartment complex. The assessor credibly testified that the subject had been misclassified, as the property housed more than four families. The assessor offered the opinion

8

that the subject property was likely under assessed for many years prior to tax year 2009. Despite the significant increase in the assessment from tax year 2008 to tax year 2009, plaintiff did not file a challenge the tax year 2009 assessment.

Plaintiff challenged the tax year 2010 assessment before the Somerset County Board of Taxation. On July 30, 2010, the county board issued a Judgment affirming the tax year 2010 assessment. Plaintiff subsequently filed a Complaint challenging the county board Judgment.

Plaintiff thereafter challenged the tax years 2011, 2012, 2013, 2014, 2015, and 2016 assessments through the filing of direct appeals by way of Complaints filed with this court. The municipality did not file a Counterclaim in any year.

The appeals for all tax years were tried together. At trial, each party offered the testimony of an expert real estate appraiser. There are seven tax years at issue, which means the court must determine the true market value of the subject property on seven valuation dates. Plaintiff's expert, however, offered an opinion of value as of only three of those valuation dates. He testified that the true market value of the subject property did not change from year to year. This is contradicted by the expert's testimony that the true market value of the subject property for tax year 2014 was less than it was for tax year 2010, and that the true market value of the subject dropped again for tax year 2016. Defendant's expert offered an opinion of value for each tax year. The opinions are summarized as follows:

| Tax Year | Valuation Date | Plaintiff's Expert | Defendant's Expert |
|----------|----------------|--------------------|--------------------|
| 2010 | 10/1/2009 | $1,540,000 | $5,500,000 |
| 2011 | 10/1/2010 | N/A | $5,900,000 |
| 2012 | 10/1/2011 | N/A | $6,400,000 |
| 2013 | 10/1/2012 | N/A | $6,800,000 |
| 2014 | 10/1/2013 | $1,520,000 | $7,000,000 |
| 2015 | 10/1/2014 | N/A | $7,200,000 |
| 2016 | 10/1/2015 | $1,328,400 | $7,600,000 |

At the close of trial, the municipality moved for judgment in its favor at the close of proofs. The court reserved decision. The parties thereafter filed post-trial written submissions in support of their positions.

## II. Conclusions of Law

The court's analysis begins with the well-established principle that "[o]riginal assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Borough of Mountain Lakes, 18 N.J. Tax 364, 373 (Tax 1998). As Judge Kuskin explained, our Supreme Court has defined the parameters of the presumption as follows:

> The presumption attaches to the quantum of the tax assessment. Based on this presumption the appealing taxpayer has the burden of proving that the assessment is erroneous. The presumption in favor of the taxing authority can be rebutted only by cogent evidence, a proposition that has long been settled. The strength of the presumption is exemplified by the nature of the evidence that is required to overcome it. That evidence must be "definite, positive and certain in quality and quantity to overcome the presumption."
>
> [Ibid. (quoting Pantasote Co. v. City of Passaic, 100 N.J. 408, 413 (1985)(citations omitted)).]

The presumption of correctness arises from the view "that in tax matters it is to be presumed that governmental authority has been exercised correctly and in accordance with law." Pantasote, supra, 100 N.J. at 413 (citing Powder Mill I Assocs. v. Township of Hamilton, 3 N.J. Tax 439 (Tax 1981)); see also Byram Twp. v. Western World, Inc., 111 N.J. 222 (1988). The presumption remains "in place even if the municipality utilized a flawed valuation methodology, so long as the quantum of the assessment is not so far removed from the true value of the property or the method of assessment itself is so patently defective as to justify removal of the presumption of validity." Transcontinental Gas Pipe Line Corp. v. Township of Bernards, 111 N.J. 507, 517 (1988).

"The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998)(citation omitted); Atlantic City v. Ace Gaming, LLC, 23 N.J. Tax 70, 98 (Tax 2006). "In the absence of a R. 4:37-2(b) motion . . . the presumption of validity remains in the case through the close of all proofs." MSGW Real Estate Fund, LLC, supra, 18 N.J. Tax at 377. In making the determination of whether the presumption has been overcome, the court should weigh and analyze the evidence "as if a motion for judgment at the close of all the evidence had been made pursuant to R. 4:40-1 (whether or not the defendant or plaintiff actually so moves), employing the evidentiary standard applicable to such a motion." Ibid. The court must accept as true the proofs of the party challenging the assessment and accord that party all legitimate favorable inferences from that evidence. Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535 (1995)). In order to overcome the presumption, the evidence "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters., LLC v. City of East Orange, 20 N.J. Tax 576, 579 (Tax 2003)(quoting Lenal Props., Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div.), certif. denied, 165 N.J. 488 (2000)), aff'd, 21 N.J. Tax 590 (App. Div. 2004).

Only after the presumption is overcome with sufficient evidence at the close of trial must the court "appraise the testimony, make a determination of true value and fix the assessment." Rodwood Gardens, Inc. v. City of Summit, 188 N.J. Super. 34, 38-39 (App. Div. 1982). If the court determines that sufficient evidence to overcome the presumption has not been produced, the assessment shall be affirmed and the court need not proceed to making a value determination. Ford

Motor Co. v. Township of Edison, 127 N.J. 290, 312 (1992); Global Terminal & Container Serv. v. City of Jersey City, 15 N.J. Tax 698, 703-04 (App. Div. 1996).

At trial, the municipality moved to dismiss the Complaints at the close of plaintiff's case based on a failure to overcome the presumption of correctness. The court denied the motion in a bench opinion. Given the indulgent standard applicable to such motions, the court concluded that plaintiff had submitted sufficient evidence to raise a doubt in the court's mind as to the correctness of the assessments. At the conclusion of defendant's case, the municipality reasserted its motion with respect to the presumption. However, in light of its prior determination, the court stated that it would consider defendant's motion to be one for judgment at the close of proofs.

Once the presumption is overcome, the "court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co., supra, 127 N.J. at 312 (quotations omitted). "[A]lthough there may have been enough evidence to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer throughout the entire case . . . to demonstrate that the judgment under review was incorrect." Id. at 314-15 (citing Pantasote, supra, 100 N.J. at 413).

A.      Approaches to Valuation.

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div.)(citing Appraisal Institute, The Appraisal of Real Estate 81 (11th ed. 2006)), certif. denied, 168 N.J. 291 (2001). "There is no single determinative approach to the valuation of real property." 125 Monitor Street, LLC v. City of Jersey City, 21 N.J. Tax 232, 237

(Tax 2004)(citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965); ITT Continental Baking Co. v. Township of East Brunswick, 1 N.J. Tax 244 (Tax 1980)), aff'd, 23 N.J. Tax 9 (App. Div. 2005). "The choice of the predominate approach will depend upon the facts of each case and the reaction of the experts to those facts." 125 Monitor, supra, 21 N.J. Tax at 238 (citing City of New Brunswick v. Division of Tax Appeals, 39 N.J. 537 (1963); Pennwalt Corp. v. Township of Holmdel, 4 N.J. Tax 51, 61 (Tax 1982)).

Both experts used the income capitalization approach to valuing the subject property. The income capitalization approach is the preferred method of estimating the value of income producing property. Parkway Village Apartments Co. v. Township of Cranford, 108 N.J. 266, 270 (1987); Hull Junction Holding Corp. v. Borough of Princeton, 16 N.J. Tax 68, 79 (Tax 1996). "In the income capitalization approach, an appraiser analyzes a property's capacity to generate future benefits and capitalizes the income into an indication of present value." Appraisal Institute, The Appraisal of Real Estate 445 (13th ed. 2008).

B.      Income Capitalization Approach.

Determining the value of real property pursuant to the income capitalization approach can be summarized as follows:

|   | |
|---|---|
| | Market Rent |
| x | Square Footage |
| | Potential Gross Income |
| | |
| - | Vacancy and Collection Losses |
| | Effective Gross Income |
| | |
| - | Operating Expenses |
| | Net Operating Income |
| | |
| ÷ | Capitalization Rate |
| | Value of Property |

See Spiegel v. Town of Harrison, 19 N.J. Tax 291, 295 (App. Div. 2001), aff'g, 18 N.J. Tax 416 (Tax 1999); Appraisal Institute, The Appraisal of Real Estate 466 (13th ed 2008).

"Central to an income analysis is the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments, supra, 108 N.J. at 270. This differs from the actual rental income realized on the property, which may be below market rates. Parkview Village Assocs. v. Borough of Collingswood, 62 N.J. 21, 29-30 (1972). However, actual income is a significant probative factor in the inquiry as to economic income. Id. at 30. "Checking actual income to determine whether it reflects economic income is a process of sound appraisal judgment applied to rentals currently being charged for comparable facilities in the competitive area." Ibid.

The opinions of value offered by plaintiff's expert under the income capitalization approach lack credibility because his opinions are not based on market rent. The expert's opinions are based on several faulty assumptions. First, the expert's report indicates that the subject property is owned by a "not for profit partnership." This is incorrect. As discussed above, the subject property is owned by a for-profit limited partnership. Although the general partner of the limited partnership is a non-profit entity, the limited partnership is not.

Second, the expert's report states that the subject property is a low-income, multi-family complex. This statement also is incorrect to the extent that it implies that the right to occupy a unit at the subject property is subject to an income limitation. No evidence introduced at trial supports the proposition that there is any income restriction on the ability to own the right to occupy a unit at the subject property. The use variance authorizing construction of the residential units at the subject property is not conditioned on resident income restrictions.

Third, the expert's report states that the residents of the subject property pay "rent." This also is incorrect. The occupants of the subject property are not tenants. They are partners in the limited partnership that owns the subject property, and the general partner of that limited partnership. Their partnership interest allows them to occupy a particular unit at the subject property and obligates them to pay an apportioned share of the cost of operating the subject property, along with other assessments. Summary Statements of Receipts and Disbursements of SCC LP for the years 2010 through 2014 reports the owner's annual income from residents of the units as "membership dues."

These errors, which may be explained by the expert's admission that he did not review any of the legal documents relating to the structure of the owner of the subject property or the right to occupy units at the subject property, effected his analysis of the subject property's market value. The expert opined that

> [b]ecause the subject is a low-income, not for profit complex, with units occupied by member/residents of a partnership, the subject would not appeal to an investor seeking cash flow and return on investment. In this instance, therefore, only the income approach specific to the subject complex is deemed appropriate in this assignment.

This proposition is inaccurate. Were the limited partnership to sell the subject property, the members of the limited partnership would no longer have the right to occupy any of the units. They have no leasehold interest in the subject property. Although plaintiff's counsel referred on the record to the residents having a "life estate" in the units they occupy, this clearly is an inaccurate representation of their rights. The residents of the subject property are partners in a limited partnership and a general partnership and their status as partners entitles them to occupy a residential unit at real property owned by the limited partnership. Were the resident partners to

exercise their collective right to sell the subject property in accordance with the terms of the partnership agreement, they would no longer be entitled to occupy residential units at the subject property. The purchaser of the subject property would, therefore, be free to rent the units on the open market, subject only to the age restriction set forth in the township's original use variance. There would be no income or profit restrictions on the purchaser.[4]

In this way, the subject property is unlike the cooperative corporation real property at issue in Elizabeth Center Apartments Urban Renewal Corp. v. City of Elizabeth, 27 N.J. Tax 196 (2013), aff'd, 28 N.J. Tax 280 (App. Div. 2014). There, the subject property was owned by a not-for-profit housing corporation organized for the sole purpose of providing low and moderate income housing pursuant to the requirements of the National Housing Act, 12 U.S.C.A. §1701-1750g. Id. at 200. The taxpayer secured funding from the Department of Housing and Urban Development ("HUD") to construct four apartment buildings with a total of 260 residential units. Id. at 199-200. The taxpayer, as was required by federal law, formed a restrictive Regulatory Agreement, By-Laws and Articles of Incorporation and managed the property exclusively to benefit low and moderate income individuals and families as determined by the rules and regulations of the Federal Housing Administration ("FHA") and HUD. Id. at 200.

In exchange for financing, the FHA and HUD were vested with extensive oversight authority with respect to the operation of the property, including the right to approve all management and operating decisions and the project's budget. Ibid. The covenants between the property owners and the FHA contained in the Regulatory Agreement run with the land, so long as there is a mortgage on the property that is either insured or owned by HUD. Ibid.

_____

[4] The court notes that plaintiff's expert testified that he was unaware of the provision of SCC, LP's by-laws that permit the limited membership to sell its assets and dissolve.

16

Residents purchase a membership certificate in the property owner that gives the holder the right to reside in a single housing unit at the property. Pursuant to the property owner's by-laws and regulations imposed by the FHA and HUD, the value of a membership certificate essentially remains the same upon sale. The sales price is determined by a formula described in the by-laws and the Regulatory Agreement. Id. at 200-201. A membership certificate will never appreciate in market value and no member will profit by the sale of a certificate. All certificate holders must meet annual income limitations imposed by HUD. Id. at 201.

Judge Brennan, when determining the true market value of the property, explained

> the restrictions imposed upon the resale price of a membership certificate at the Subject property are at odds with the concept of market value based upon a fair and bona fide sale by private contract. For reasons associated with public policy, the full and fair value of a Taxpayer membership certificate is artificially depressed by the limitations imposed on the sale of a member's share as dictated by Article III, Section 8(d) of the By-Laws, unlike properties available in a free market. The court finds that this situation has created a limited and unique market in which to determine the Subject Property's true value.

[Id. at 212.]

In light of this conclusion, the court applied the cooperative sales comparison approach established in Southbridge Park, Inc. v. Borough of Fort Lee, 4 N.J. Tax 30, (Tax 1981), aff'd, 6 N.J. Tax 351 (App. Div. 1984), to determine the value of the property. In Southbridge, the court concluded that the value of a cooperative corporation's real property is determined through the use of sales at the subject property, combined with the mortgage debt on the property. Id. at 203.

Here, the subject property is not owned through a cooperative corporation. There are no government restrictions on the management, operation, or budget of the subject property. No income limitations apply to the residents. Most importantly, there is no governmental regulation

17

of the amount for which the subject property may be sold, and no restriction on the ability of the for-profit limited partnership that owns the subject property to sell it at market value.

Any restrictions beyond the age restriction that presently apply to the transfer of interest in the limited partnership and general partnership that would allow the purchaser to reside at the subject property are self-imposed by plaintiff and the members of the relevant partnerships. Those self-imposed restrictions do not run with the land and do not preclude the sale of the subject property for market consideration. While plaintiff may elect to forego market rate income from the subject property, that election by plaintiff does not insulate the subject property from an assessment at true market value.

Plaintiff's expert used the income-approach to determine value. However, in his analysis he did not ascertain market rent for the residential units at the subject. He instead used what he described as "income" derived at the subject for a few of the years in question. The "income" on which he relied, however, was the membership dues collected by the limited partnership from residents. Those dues are not rental income, but are the allocated costs of operating the subject property and creating a reserve for capital improvements and repairs. There is nothing about those figures that reflect market rent.[5]

Shortly after the formation of this court, Judge Andrew issued his opinion in Korvettes Home Furnishing Center v. Borough of Elmwood Park, 1 N.J. Tax 287 (Tax 1980), and set a clear rule on determining market rent for purposes of the income capitalization approach to valuation. He concisely stated:

---

[5] Notably, plaintiff's expert testified that the limited partnership must restrict the monthly fee "to what the members of the partnership can afford." There is no evidence in the record supporting this assertion.

> Lease agreements of comparable space must be reviewed in order to arrive at an estimate of economic rental which the subject could be expected to produce in the rental market for the years in question.
>
> [Id. at 291.]

This holding has been followed by the court on a number of occasions. Harrison Realty Corp. v. Town of Harrison, 16 N.J. Tax 375, 383 n.3 (Tax 1997), aff'd, 17 N.J. Tax 174 (App. Div.), certif. denied, 153 N.J. 213 (1998); Town of Irvington v. 1125-1127 Clinton Avenue Assocs., 5 N.J. Tax 420, 427 (Tax 1983).

What plaintiff's expert did was capitalize the actual expenses at the subject property. He did not examine leases in the market. This analysis offers nothing useful in determining the true market value of the subject property for local property tax purposes.[6]

The court also declines to accept the opinions of value offered by defendant's expert. Using the income-capitalization approach, the expert determined market rent for the subject. He acknowledged that the subject property is restricted to residents 55 and over, and that no minor children may reside at the property. These government-imposed restrictions must be considered when determining true market value. Prowitz v. Village of Ridgefield Park, 237 N.J. Super. 435 (App. Div. 1989), aff'd, 122 N.J. 199 (1991)(holding that government restrictions that limit the market value of real property must be considered when determining true market value for local

---

[6] Although the expert's failure to identify market rent is a sufficient basis for rejecting his opinions of value, the court notes that plaintiff's expert could not explain how he arrived at a capitalization rate for the subject property, given his opinion that the subject property would never sell on the open market, other than stating "I had to come up with something." In addition, plaintiff's expert used a vacancy rate for the subject property, even though he conceded that membership dues must be paid whether the relevant unit is occupied or not. This approach suggests confusion on the part of plaintiff's expert, who also testified that a certificate holder's right to occupy a unit terminates in the event that the resident is moved to a nursing home. That observation is incorrect.

property tax purposes). The expert did not rely on comparable leases from age-restricted rental properties, citing a dearth of such properties in Franklin Township. He offered his opinion, however, that the over-55 residential sales market in the township was strong during the years in question and that he held the opinion that tenants over the age of 55 would pay the same rental rates as would apply to the general market.

The court finds this proposition to undermine the credibility of the expert's market rent. While it may be true that a thriving residential sales market exists in the township of age-restricted houses, the expert cited no evidence suggesting that the age-restricted rental mark also was strong. Nor did he provide an analysis of whether the age-restricted rental market is the equivalent for market rent purposes of the general rental market. The expert acknowledged that age-restricted rental units exist in communities near Franklin Township, but he decided not to investigate leases from those facilities.

In addition, defendant's expert made no adjustment, either to market expenses or the capitalization rate, to account for the issue of access to Cedar Grove Lane. A purchaser would either have to secure the approval of the Church to obtain the existing access easement (which might come at a cost), or construct alternative access to Cedar Grove Lane over the subject property (which certainly would have a cost). It appears that the expert proceeded on the assumption that access would be obtained through transfer of the easement without cost to the purchaser. He did this, however, with no analysis of the likelihood of such an outcome in the marketplace.

The court is unable to identify any evidence in the record that would permit it to fill these gaps in the analysis of defendant's expert. The court, therefore, declines to accept his opinions of value.

Having determined that the record does not contain sufficient evidence upon which to make a determination by the preponderance of the evidence of the true market value of the subject property on the relevant valuation dates, the court is constrained to affirm the assessments. Plaintiff has not met its burden of proof. Defendant's motion for judgment at the close of proofs is granted.[7]

The court would be remiss if it did not acknowledge that the subject property is intended to provide affordable housing to elderly residents. Despite this salutary purpose, the Church and the residents of the subject property elected to resolve their 2002 litigation by transferring the property to a for-profit limited partnership, the members of which are entitled to occupy a residential unit on the property. Presumably, there was some benefit to this unusual ownership structure, as opposed to transferring the property to a non-profit entity that might qualify for an exemption from local property taxes. It is well established in this State that a taxpayer is free to order its business affairs in any manner it deems fit, but must bear the tax consequences of its voluntary business decisions. See General Trading Co. v. Director, Div. of Taxation, 83 N.J. 122 (1980). Contrary to the arguments of plaintiff's counsel, this court has no equitable authority to value the subject property at less than its true market value. Plaintiff has the right to sell the subject

---

[7] Although not pursued a great length, plaintiff's counsel suggested that the tax year 2009 assessment was an illegal spot assessment, see Township of West Milford v. Van Decker, 120 N.J. 354, 365 (1990). Because the tax year 2009 assessment was reduced for tax year 2010, it is likely that any valid claim of spot assessment for tax year 2009 would not result in the invalidation of the tax year 2010 assessment. See Shippee v. Township of Brick, 20 N.J. Tax 427, 428 (Tax 2002)(allowing a taxpayer to argue that an invalid spot assessment in a year not appealed by the taxpayer would invalidate the subsequent year's assessment if there had been no change in the assessment). Moreover, the court is satisfied that the tax year 2010 assessment was entered pursuant to an approved municipal-wide reassessment program after due consideration of market data by the tax assessor.

property in the market to a purchaser who would be restricted only by the resident-age limitation created by the municipality. That such a turn of events is unlikely does not mean that the court can set an assessment at less than true market value.[8]

Very truly yours,

/s/ Hon. Patrick DeAlmeida, P.J.T.C.

---

[8] The rather heated allegation in plaintiff's supplemental brief that "Franklin Township is simply rendering these senior citizens homeless because they no longer 'need' or are benefitting from them," (Pb8), is without evidentiary support in the record. No witness offered testimony that any resident of the subject property was forced to forfeit their ownership interest in plaintiff because of the increase in monthly membership fees occasioned by the tax assessments at issue, let alone that any such person was rendered homeless as a result.